616 So.2d 562 (1993)
FLORIDA FERN GROWERS ASSOCIATION, INC., et al., Appellants,
v.
CONCERNED CITIZENS OF PUTNAM COUNTY, etc., et al., Appellees.
No. 92-1039.
District Court of Appeal of Florida, Fifth District.
April 2, 1993.
*563 Harlan L. Paul of Zimmerman, Paul & Bauer, DeLand, for appellants.
Kenneth B. Wright, Tallahassee, for appellees.
DAUKSCH, Judge.
This is an appeal from an order dismissing with prejudice appellant Florida Fern Growers Association, Inc.'s complaint for injunctive relief, and for damages for intentional and malicious interference with advantageous business relationships and conspiracy to intentionally and maliciously interfere with advantageous business relationships. Appellees, the Concerned Citizens of Putnam County, Inc. filed various petitions with the St. Johns River Water Management District challenging the issuance of consumptive water use permits to members of appellant in the fern growing industry. It is appellees' position that they have a constitutional free speech right and a constitutional right to petition the government both of which are greater than any asserted right of appellant to be free from tortious conduct.
On January 6, 1992, appellant filed its First Amended Complaint seeking injunctive relief and alleging intentional and malicious interference with advantageous business relations and conspiracy to interfere with advantageous business relations. Appellees moved to dismiss this complaint, arguing that their actions in petitioning the *564 government about the public issue of consumptive use of water were privileged under the United States and Florida Constitutions. They argued that their reasons for choosing to focus their attention on water use by ferngrowers need not be objectively compelling because they were entitled to petition the government no matter what their beliefs. They argued that for the proceedings to subject them to civil liability they must be instituted not to obtain governmental action but to otherwise injure the plaintiff. Appellees argued that because appellant's complaint admitted that appellees' petitions were at least in part motivated by their concern over public policy, the issue of water consumption, that motivation cloaked their actions with a constitutional privilege and therefore appellant's complaint must be dismissed with prejudice.
On March 27, 1992, the trial court issued an order of dismissal with prejudice finding that the complaint failed to state a cause of action, stating that:
To state a claim upon which relief can be granted in a tortious interference case, malice must be the sole basis for the interference. Boehm v. American Bankers Ins. Group, 557 So.2d 91, 95 (Fla. 3d DCA 1990).
The actions that form the basis for Plaintiffs' complaint are that the Defendants filed petitions with the St. Johns River Water Management District, under Florida's Administrative Procedure Act, challenging the issuance of consumptive water use permits to members of the ferngrowing industry. Plaintiffs' allegations are not sufficient to vitiate Defendants' privilege to petition the government under the Federal and Florida Constitutions. U.S. Const. Amend. I; Art. I Sect. 5, Florida Constitution; Gray v. Rodriguez, 381 481 So.2d 1298, 1299 (Fla. App. 3d Dist. 1986); and see Protect Our Mountain Environment v. District Court, 677 P.2d 1361 (Colo. 1984).
This appeal followed and we reverse.
In reviewing the trial court's granting of a motion to dismiss, this court is limited to accepting the allegations of the complaint as true. Londono v. Turkey Creek Inc., 609 So.2d 14, 19 n. 4 (Fla. 1992); Cutler v. Board of Regents, 459 So.2d 413, 414 (Fla. 1st DCA 1984). We find the ferngrowers' complaint sufficiently alleges claims for injunctive relief, tortious interference with advantageous business relations, and conspiracy to tortiously interfere with advantageous business relations.
A party seeking injunctive relief in Florida must demonstrate: 1) irreparable harm; 2) a clear legal right; 3) an inadequate remedy at law; and 4) consideration of the public interest. St. Lucie County v. St. Lucie Village, 603 So.2d 1289, 1292 (Fla. 4th DCA), rev. den., 613 So.2d 12 (Fla. 1992). "A complainant alleging irreparable injury must state facts which will enable the court to judge whether the injury will in fact be irreparable." Waters v. School Bd. of Broward County, 401 So.2d 837, 838 (Fla. 4th DCA 1981). Count I of appellant's complaint alleges that appellees are causing irreparable harm to appellant by objecting to "each and every application for consumptive [water] use permits" by the members of appellant to the St. Johns River Water Management District ("the District"). Appellant charges that appellees have "targeted" its members to the exclusion of all other agricultural, industrial and recreational consumptive users, aiming to put appellant out of business. Appellant seeks a permanent injunction enjoining appellees from filing such "sham pleadings" directed to the applications members of the fern growing industry are required to file with the District to obtain consumptive use permits for water consumption. We find Count I of appellant's complaint sufficiently alleges a claim for injunctive relief.[1]
*565 Elements of the tort of intentional interference with an advantageous business relationship are: 1) the existence of a business relationship, not necessarily evidenced by an enforceable contract; 2) knowledge of the relationship on the part of the defendant; 3) an intentional and unjustified interference with that relationship by the defendant; and 4) damage to the plaintiff as a result of the breach of the relationship. Nowik v. Mazda Motors of America (East), Inc., 523 So.2d 769, 771 (Fla. 1st DCA 1988); McCurdy v. Collis, 508 So.2d 380, 382-383 (Fla. 1st DCA), rev. den., 518 So.2d 1274 (Fla. 1987). Appellant in Count II of the complaint alleged that appellees engaged in their campaign to object to each application for consumptive use with the intent of interfering with appellant's business relationship between members of appellant and their fern buyers. Appellant alleges appellees knew of this relationship, and alleges that appellees' campaign was unjustified because appellees attempted to put the ferngrowers out of business, as opposed to any other water user, whether industrial, agricultural or business; appellant alleges appellees are unable to show that they are or would be substantially affected by the consumptive use of ground or surface water by ferngrowers. In particular appellant alleges members of the industry have been damaged by delays in the permitting process caused by appellees' campaign. We find that Count II of appellant's complaint sufficiently alleges a claim for tortious interference with advantageous business relations.
The essentials of a complaint for civil conspiracy are: (a) a conspiracy between two or more parties, (b) to do an unlawful act or to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to plaintiff as a result of the acts done under the conspiracy. Kent v. Kent, 431 So.2d 279, 281 (Fla. 5th DCA 1983). Such a tort is actionable "where a plaintiff can show some peculiar power of coercion possessed by the conspirators by virtue of their combination, which power an individual could not possess." Buckner v. Lower Florida Keys Hosp. Dist., 403 So.2d 1025, 1029 (Fla. 3d DCA 1981), rev. den., 412 So.2d 463 (Fla. 1982). Count III of appellant's complaint alleges that appellees conspired between themselves to individually file objections to each consumptive use of water of the ferngrowers with the sole intent of causing such damages to appellant as to put the ferngrowers out of business. Appellant attached to its complaint the petitions appellant alleged appellees conspired to file. As discussed above we find appellant has sufficiently alleged a claim for tortious interference with business relations. An actionable conspiracy requires an actionable underlying tort or wrong. Wright v. Yurko, 446 So.2d 1162, 1165 (Fla. 5th DCA 1984). We further find that Count III of appellant's complaint states a claim for civil conspiracy.
Appellees, the Concerned Citizens, however, urge this court to find the amended complaint legally insufficient and to employ a heightened pleading standard, requiring appellant to allege specific activities of appellees which vitiate privileges associated with the constitutional right to petition the government. In Sierra Club v. Butz, 349 F. Supp. 934 (N.D.Cal. 1972), the court stated that:
Liability can be imposed for activities ostensibly consisting of petitioning the government for redress of grievances only if the petitioning is a "sham," and the real purpose is not to obtain governmental action but to otherwise injure the plaintiff.
Id. at 939. The Sierra Club court reasoned that the "sham" test was required because malice is "easy" to allege and the "sham" test would allow the First Amendment "breathing space" required to protect the rights of citizens petitioning the government. Id. at 938-939. Federal and state courts subsequently applying the "sham" test have employed a heightened pleading standard to state a claim for civil liability based upon asserted petitioning activities. See e.g. Oregon Natural Resources Council v. Mohla, 944 F.2d 531, 533 (9th Cir.1991); Protect Our Mountain Env't, Inc. v. Dist. Court, 677 P.2d 1361, 1369 (Colo. 1984). However, we are moved *566 to reject the "sham" test based on the Supreme Court of Florida's recent opinion in Londono v. Turkey Creek, supra. There the Supreme Court of Florida explicitly rejected the "sham" test of the Sierra Club court and found that current Florida tort law "already provides protection for the First Amendment right to petition the government," Londono, 609 So.2d at 18. Because no heightened pleading standard is applicable, we find appellant's complaint sufficiently alleges claims for injunctive relief, tortious interference with advantageous business relations, and conspiracy to tortiously interfere with advantageous business relations.
After independence the First Amendment to the Constitution guaranteed that "Congress shall make no law ... abridging the freedom of speech, or the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances." U.S. Constitution Amendment I. In Thomas v. Collins, 323 U.S. 516, 65 S.Ct. 315, 89 L.Ed. 430 (1945), the United States Supreme Court noted:
It was not by accident or coincidence that the rights to freedom in speech and press were coupled in a single guaranty with the rights of the people peaceably to assemble and to petition for redress of grievances. All these, though not identical, are inseparable. They are cognate rights ... and therefore are united in the First Article's assurance.
323 U.S. at 530, 65 S.Ct. at 323. Article I, section 4 of the Florida Constitution, on freedom of speech and press, states that "[e]very person may speak, write and publish his sentiments on all subjects but shall be responsible for the abuse of that right..." Section 5, on the right to assemble, states that "[t]he people shall have the right peaceably to assemble, to instruct their representatives, and to petition for redress of grievances."
Appellees, the Concerned Citizens, assert that the constitutional right to petition provides absolute protection from infringement in the form of civil liability. Some courts have indeed asserted an absolute protection for the exercise of the right to petition, but they have done so based not on First Amendment precedent, but rather based on an antitrust doctrine, the so-called Noerr-Pennington Doctrine. In Eastern R.R. Presidents Conf. v. Noerr Motor Freight, Inc., 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), ("Noerr") trucking operators and their trade association brought suit against a number of railroads under sections one and two of the Sherman Act. 15 U.S.C. §§ 1-2 (1982). The trucking operators claimed that a railroad sponsored publicity campaign to create public support for anti-trucking laws was an illegal attempt to monopolize the freight industry. The railroads filed a counterclaim arguing that the truckers sought to establish a monopoly through similar political activities. Noerr, 365 U.S. at 129, 81 S.Ct. at 525. The supreme court dismissed the claims and held that the Sherman Act did not reach political activity and therefore a plaintiff harmed by petitioning activity may not recover under the Sherman Act. The court also held that neither the anticompetitive purpose of the railroads in initiating the advertising campaign nor their deception in conducting the campaign were relevant to antitrust analysis. Noerr, 365 U.S. at 138-141, 81 S.Ct. at 530-31. The court acknowledged that a holding the Sherman Act applied to political activity "would raise important constitutional questions. The right of petition is one of the freedoms protected by the Bill of Rights and we cannot, of course, lightly impute to Congress an intent to invade these freedoms." Noerr, 365 U.S. at 138, 81 S.Ct. at 530. But the court avoided ruling on the railroads' insistence that their activities were protected by the First Amendment:
The answer to the truckers' complaint also interposed a number of other defenses, including the contention that the activities complained of were constitutionally protected under the First Amendment... Because of the view we take of the proper construction of the Sherman Act, we find it unnecessary to consider any of these other defenses.
Noerr, 365 U.S. at 132, n. 6, 81 S.Ct. at 525-27, n. 6.
*567 In United Mine Workers v. Pennington, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965) ("Pennington"), the court reaffirmed Noerr. In Pennington a union and a number of large coal companies allegedly engaged in a scheme to drive smaller firms out of business by persuading the Secretary of Labor to establish a high minimum wage for employees of companies selling coal to the Tennessee Valley Authority (TVA), and by convincing the TVA to curtail spot marketing purchases. 381 U.S. at 660-661, 85 S.Ct. at 1588-89. The court held that the political lobbying complained of could not violate the Sherman Act.
The last of the trilogy of Noerr-Pennington antitrust cases was California Motor Transp. Co. v. Trucking Unlimited, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972), in which one group of highway carriers sued another group alleging that the defendants attempted to monopolize the industry in violation of the Clayton Act, 15 U.S.C. § 15 (1982), by repeatedly challenging the plaintiffs' license applications before courts and regulatory agencies. The court held that the plaintiffs, who had alleged abuse of process, had stated a claim for antitrust liability, and the case was remanded for trial. The court held that, as mentioned in dicta in Noerr, 365 U.S. at 144, 81 S.Ct. at 533, supposed petitioning may be nothing more than a "sham," and "[a] pattern of baseless, repetitive claims may emerge which leads the fact finder to conclude that the administrative and judicial processes have been abused... . [A]ctions of that kind cannot acquire immunity by seeking refuge under the umbrella of `political expression.'" California Motor, 404 U.S. at 513, 92 S.Ct. at 613. One commentator notes that while many have interpreted California Motor to say that the constitution requires an absolute immunity from civil liability for any petitioning activity unless that activity is a "sham," the case "actually demands no more than scrutiny of whether a valid governmental interest, such as regulation of anti-competitive activity, may infringe First Amendment activity." Zauzmer, "The Misapplication of the Noerr-Pennington Doctrine in Nonantitrust Right to Petition Cases," 36 Stanford Law Review 1243, 1253 (1984). Zauzmer notes that even a sham petition includes some protected behavior, litigation, contacts with officials and so forth, but in order to enforce the antitrust laws, prevent the misuse of governmental process, or other legitimate goals, it may be necessary for the government to infringe the protected activity as well, and whether such infringement is permitted by the constitution ought to depend on an examination of the competing interests of the government and the individual. Id. at 1253. The original Noerr-Pennington line of cases, then, hardly supports the notion argued by appellees that there exists an absolute privilege for petitioning activities.
However, among the courts applying the Noerr-Pennington doctrine outside the area of antitrust law to find an absolute immunity for the exercise of the right to petition is the above-mentioned federal district court opinion in Sierra Club v. Butz, supra. Appellees note the court there held that petitioning was immune from tort liability for interference with an advantageous business relationship. The action arose as a counterclaim by a logging company to the Sierra Club's suit seeking a logging ban in an area being considered for a wilderness designation. The court decided that the environmental suit was not a sham, but a legitimate attempt to influence government action protected by the right to petition, and therefore could not be subject to any tort liability. Sierra Club, 349 F. Supp. at 939. The court held that only absolute immunity adequately protected the right to petition, since any possibility of tort liability might deter those who wanted to petition. Sierra Club, 349 F. Supp. at 938.
In another case brought to the attention of this court by appellees, Webb v. Fury, 167 W. Va. 434, 282 S.E.2d 28 (1981), the West Virginia Supreme Court extended Noerr-Pennington immunity into the field of libel law. The court dismissed a libel action by a coal mining company against environmental groups that allegedly libeled the company in a newsletter, as well as in communications to the Environmental Protection *568 Agency and to the Office of Surface Mining. The court held:
Although the Noerr-Pennington Doctrine arose in the context of antitrust litigation, and most Noerr-Pennington applications involve antitrust suits, it is apparent that the foundation of the doctrine, and of the sham exception rest upon solid First Amendment grounds rather than upon a limited construction of the Sherman Act.
* * * * * *
Clearly the Noerr-Pennington Doctrine is a principle of constitutional law which bars litigation arising from injuries received as a consequence of First Amendment petitioning activity, regardless of the underlying cause of action asserted by the plaintiffs.
282 S.E.2d at 36-37. The court based its decision on the right to petition in the State of West Virginia Constitution as well as the First Amendment. Webb, 282 S.E.2d at 33.
In another case relied upon by appellees and the trial court below, Protect Our Mountain Env't, Inc. v. District Court, 677 P.2d 1361, 1369 (Colo. 1984), the Supreme Court of Colorado dismissed a complaint for damages based on the torts of abuse of process and civil conspiracy filed against the Protect Our Mountain Environment, Inc. group by a developer who had obtained rezoning decisions from a board of county commissioners. The court required the heightened pleading standard mentioned by the Sierra Club v. Butz court.
We must reject these precedents because the Supreme Court of Florida in its Londono decision has decided that right to petition decisions should adopt analogous speech and association precedents. In Londono, Turkey Creek, Inc. ("Turkey Creek") was a Florida corporation whose primary business was the development and sale of residential land in a planned unit development (PUD) known as Turkey Creek. The homeowners, including Xavier Londono, M.D. were residents of the development. In March 1982 the homeowners filed suit against Turkey Creek seeking a declaratory judgment and damages in connection with Turkey Creek's operation of the PUD. Turkey Creek filed its answer and eventually obtained a final judgment and costs in its favor.
Turkey Creek subsequently sued the homeowners for tortious interference with contractual rights, tortious interference with an advantageous business relationship and conspiracy to interfere with Turkey Creek's contractual rights and business relationships. The suit was based on allegations that from early 1982 through May 1984, the homeowners publicly distributed false information that the land within the PUD was in "distress" and that the title was unmarketable and impaired. Among other things, the homeowners allegedly publicly distributed this false information to local zoning officials, who denied or delayed Turkey Creek's petitions for rezoning based on the homeowners' statements to the zoning officials. Turkey Creek also alleged that because of the homeowners' intentional distribution of malicious and false information, it had lost a contract which cost it four million dollars in expected profits. The trial court dismissed Turkey Creek's claims for tortious interference and for civil conspiracy because the complaint failed to state a cause of action but the district court reversed. Turkey Creek, Inc. v. Londono, 567 So.2d 943 (Fla. 1st DCA 1990). In affirming the district court's reversal, the supreme court rejected the argument that the homeowners' comments to the county's zoning officials were absolutely privileged under the First Amendment.
The homeowners' organization and the State in Londono contended that because malice was easy to allege, the "sham" test would "allow the First Amendment breathing room to protect the rights of citizens petitioning the government." But the Supreme Court of Florida disagreed:
We decline to adopt the "sham" test because we find that the current law in Florida already provides protection for the First Amendment right to petition the government. In Nodar v. Galbreath, 462 So.2d 803 (Fla. 1984), this *569 court addressed the issue of whether a parent who makes statements concerning a teacher's qualifications at a school board meeting could be held liable for defamation. The Court first determined that the teacher was a private person and not a public official; thus the law required the plaintiff to show express malice as opposed to actual malice. The Court then stated the rule of law that:
"One who publishes defamatory matter concerning another is not liable for the publication if (a) the matter is published upon an occasion that makes it conditionally privileged and (b) the privilege is not abused."

Nodar, 462 So.2d at 809 (quoting Restatement (Second) of Torts § 593 (1976)). Thus, in Nodar the Court found that the parent's remarks were privileged as a matter of law on the ground of "statements of a citizen to a political authority." Id. at 810. The court then examined the record to determine if the parent's remarks abused the speaker's conditional privilege. After examining the parent's remarks, the Court concluded that the parent had not abused his privilege of speaking to the school board and thus the evidence was insufficient to show express malice. Id. at 811. We find that the test used in Nodar adequately protects the Homeowners' First Amendment rights and adequately guards against the danger of intimidation suits. Thus, we decline to adopt the "sham" test as set out by the federal court.
Londono, 609 So.2d at 18.
While appellees criticize appellant for equating "the limited immunity from suit accorded under the First Amendment" with the qualified privilege of Florida's common law, the supreme court's recent opinion in Londono does exactly this, relying upon its prior opinion in Nodar v. Galbreath, supra. The Nodar court found several legal grounds for holding that a father's remarks about his child's teacher to the school board "were made upon a privileged occasion." Nodar, 462 So.2d at 809. The court first found that the statements were privileged based on mutuality of interest and speaker. "A communication made in good faith on any subject matter by one having an interest therein, or in reference to which he has a duty, is privileged if made to a person having a corresponding interest or duty, even though it contains matter which would otherwise be actionable, and though the duty is not a legal one but only a moral and social obligation." Nodar, 462 So.2d at 809. Another ground for holding that the father's remarks about his child's teacher were conditionally privileged was that "[u]nder the common law of Florida, a communication to an employer regarding his employee's performance is conditionally privileged, and the mode, manner or purpose of the communication would go to the question of abuse or forfeiture of the privilege." Id. Next, the court noted that another recognized legal ground for holding that the father's statements were privileged was that "they were statements of a citizen to a political authority regarding matters of public concern, i.e., the school curriculum and the performance of a public employee" and "[y]et another arguable ground" was "the privilege of every person to express to other persons his fair comment and criticism on any public, governmental, political, social, or cultural matters." Nodar, 462 So.2d at 810, n. 5. The supreme court in Nodar noted that all these grounds of qualified privilege "have existed in the law of Florida for many generations and have served to provide broad protection" in the First Amendment area. Id. at 810.
Appellant thus seems correct in asserting that even where a qualified privilege exists, i.e. "statements of a citizen to a political authority regarding matters of public concern," that privilege carries with it the "obligation to employ means that are not improper," Turkey Creek, Inc. v. Londono, 567 So.2d at 948; McCurdy v. Collis, 508 So.2d at 384 and "the mode, manner or purpose of the communication would go to the question of abuse or forfeiture of the privilege." Nodar, 462 So.2d at 809. Thus, even if appellees' remarks to and activities before the District were conditionally privileged, factual questions remain *570 whether the mode, manner, or purpose of their communication amounted to abuse or forfeiture of the privilege.
The trial court's order states that "malice must be the sole basis for the interference" in a case of tortious interference with advantageous business relations, citing to Boehm v. American Bankers Ins. Group, Inc., 557 So.2d 91, 95 (Fla. 3d DCA), rev. den., 564 So.2d 1085 (Fla. 1990). While this is a correct statement of Florida law, appellees erroneously seem to rely on the case to argue that the trial court correctly dismissed the amended complaint. The Boehm decision itself makes clear that the question of malice is one of fact. Only "[w]here the circumstances surrounding a defamatory communication are undisputed, or are so clear under the evidence as to be unquestionable, then the question of whether the occasion upon which they were spoken was privileged is a question of law to be decided by the court." Nodar v. Galbreath, 462 So.2d at 810. The circumstances of appellees' activities before the District cannot be characterized as undisputed, given the allegations in appellant's complaint. When dealing with issues of qualified privilege, the question of whether a privilege exists or has been exceeded in some manner creates a mixed question of law and fact which normally should be determined by the trier of fact. Healy v. Suntrust Service Corp., 569 So.2d 458, 460 (Fla. 5th DCA 1990); Glynn v. City of Kissimmee, 383 So.2d 774, 776 (Fla. 5th DCA 1980).
We are aware of the Concerned Citizens of Putnam County's argument that the present lawsuit reflects a standard tactic in environmental litigation. See Pring G.W., "SLAPPs: Strategy Lawsuits Against Public Participation," 7 Pace Environ.Law Review 3 (1989); Note, "Counterclaim and Countersuit Harassment of Private Environmental Plaintiffs: The Problem, Its Implications and Proposed Solutions," 74 Mich.L.Rev. 106, 110-111 (1975). The term "SLAPP" was coined by two University of Denver professors, George W. Pring and Penelope Canan. A SLAPP suit has been described as "one filed by developers, unhappy with public protest over a proposed development, filed against leading critics in order to silence criticism of the proposed development." Westfield Partners, Ltd. v. Hogan, 740 F. Supp. 523, 525 (N.D.Ill. 1990). In Monia v. Parnas Corp., 227 Cal. App.3d 1349, 278 Cal. Rptr. 426, 435 (1991), Dr. Canan defined:
SLAPP suits as civil actions for damages brought against individual citizens or citizens' groups for advocating issues of public importance by contacting a public official or the electorate. SLAPP suits are characterized by an effort to punish political opponents for past behavior, an attempt to preclude their future political effectiveness, the desire to warn others that political opposition will be punished, the use of the judicial system as a part of an economic strategy, or some combination of the above attributes. Groups targeted by SLAPP suits often lose members, funds, and political potency.
Appellees argue that the very pendency of such lawsuits as the instant one would have a chilling effect on First Amendment activity. However, extending absolute immunity to such activities would seem to extend to these activities a broader protection than the Constitution itself guarantees. Florida's Constitution provides that persons "shall be responsible for the abuse" of their free speech rights. Article I, § 4, Florida Constitution. Further, our Constitution provides that the courts shall be "open to every person for redress of any injury, and justice shall be administered without sale, denial or delay." Article I, § 21, Florida Constitution. To extend absolute immunity to appellees for their activity in the instant case would be to deny appellant its access to the courts. This we will not do.
Because we find that the trial court erred in dismissing appellant's amended complaint with prejudice, we reverse and remand for further proceedings.
REVERSED and REMANDED.
HARRIS and DIAMANTIS, JJ., concur.
NOTES
[1] In the event the trial court determines that injunctive relief may lie in this case, the trial court should fashion such injunctive relief as to not prohibit as a prior restraint any activities which fall within the ambit of the first amendment. See Zimmerman v. D.C.A. at Welleby, Inc., 505 So.2d 1371 (Fla. 4th DCA 1987).