# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| BOBCAT NORTH AMERICA, LLC, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| INLAND WASTE HOLDINGS, LLC; | ) | |
| RSMDBB HOLDINGS, LLC; BART | ) | |
| A. BEGLEY; MONTGOMERY M. | ) | |
| DAVISON; and ROBERT A. | ) | |
| SMITH, | ) | |
| Defendants. | ) | |
| _____ | ) | C.A. No. N17C-06-170 PRW |
| | ) | CCLD |
| INLAND WASTE HOLDINGS, LLC; | ) | |
| RSMDBB HOLDINGS, LLC; BART | ) | |
| A. BEGLEY; MONTGOMERY M. | ) | |
| DAVISON; ROBERT A. SMITH; | ) | |
| INLAND SERVICE | ) | |
| CORPORATION, LLC; and | ) | |
| INLAND SERVICE OF FLORIDA, | ) | |
| LLC, | ) | |
| Counterclaim Plaintiffs | ) | |
| and Intervenors, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BOBCAT NORTH AMERICA, LLC, | ) | |
| Counterclaim | ) | |
| Defendant. | ) | |

Submitted: January 23, 2019
Decided: April 26, 2019

*Upon Plaintiff/Counterclaim Defendant Bobcat North America, LLC's
Motion for Partial Summary Judgment,*
**GRANTED** in part; **DENIED** in part.

## MEMORANDUM OPINION AND ORDER

Joel Friedlander, Esquire, Christopher M. Foulds, Esquire, Christopher P. Quinn, Esquire, Friedlander & Goris, P.A., Wilmington, Delaware, Andrew J. Wronski, Esquire (*pro hac vice*) (argued), Max B. Chester, Esquire (*pro hac vice*), Andrew M. Meerkins, Esquire (*pro hac vice*), Foley & Lardner LLP, Milwaukee, Wisconsin, Attorneys for Plaintiff/Counterclaim Defendant.

David S. Eagle, Esquire, Sean M. Brennecke, Esquire, Klehr Harrison Harvey Branzburg LLP, Wilmington, Delaware, William T. Hill, Esquire (*pro hac vice*) (argued), Gregory R. Sellers, Esquire (*pro hac vice*), Klehr Harrison Harvey Branzburg LLP, Philadelphia, Pennsylvania, Attorneys for Defendants/Counterclaim Plaintiffs.

**WALLACE, J.**

## I.    INTRODUCTION

Plaintiff Bobcat North America, LLC ("Bobcat") brings this action against Defendants Inland Waste Holdings, LLC ("Inland Holdings"), RSMDBB Holdings, LLC ("RSMDBB"), Bart A. Begley ("Begley"), Montgomery M. Davison ("Davison"), and Robert A. Smith ("Smith", together with Begley and Davison, the "Sellers") (Sellers, together with Inland Holdings and RSMDBB, "Inland") for claims arising out of Bobcat's acquisition from Inland of a waste management business consisting of Inland Waste Solutions, LLC ("Inland Solutions"), ABC Leasing Company, LLC ("ABC"), and Inland Service Corporation, LLC ("Inland Service") (together with Inland Solutions and ABC, the "Company"). Bobcat's Complaint is based on Inland's alleged misrepresentation of the Company's financial statement, customer relationships, and assets to inflate the acquisition price. Bobcat brings one count each of fraud, negligent misrepresentation, and breach of contract through which it seeks, *inter alia*, declaratory judgment and indemnification.

Inland answered the Complaint and, together with intervenors Inland Service and Inland Service of Florida, LLC ("Inland Florida") (where necessary, the reference to Inland also includes "Inland Service" and "Inland Florida"[1]) bring

---

[1]    The Court acknowledges that Inland Service and Inland Florida are intervenors. Given the relationship among each of the Inland-affiliated parties, particularly their direct or indirect control

-1-

against Bobcat counterclaims via two counts of tortious interference, one count of

defamation, a breach-of-contract count, and an indemnification claim.

Now before the Court is Bobcat's Motion for Partial Summary Judgment.[2]

For the reasons stated below, the Court **GRANTS** Bobcat's Motion, in part, and

**DENIES** it, in part.

---

by Begley, Davison, and Smith, the Court uses "Inland" to reference all the relevant Inland-related parties, and identifies the specific party where necessary.

[2] After Bobcat filed its Motion for Partial Summary Judgment in October 2018, it sought and obtained the Court's approval for leave to amend its complaint. Bobcat's leave to amend was unopposed by Inland. Bobcat filed its amended complaint (its second) in November 2018 [cited hereinafter as "Second Am. Compl."]. Bobcat's amended complaint asserts additional facts in connection with Inland's alleged breach of contract and misrepresentation. But those additional factual allegations do not affect Bobcat's current motion or Inland's opposition thereto. So the Court finds it unnecessary for the parties to further amend their respective motion papers. Instead, the Court considers the amended complaint's additional factual allegations and those from Inland's amended answer when deciding this motion for partial summary judgment.

## II. FACTUAL AND PROCEDURAL BACKGROUND

The Court summarizes here only the factual background pertinent to this motion. The Court extracts this background from the undisputed facts found in Bobcat's complaint (and its amendments), Inland's counterclaims (and their amendments), and the parties' motion submissions of affidavits and exhibits.

### A. THE PARTIES AND INLAND'S CONTEMPLATED SALE OF THE COMPANY.

Bobcat is a limited liability company with its principle place of business in Sarasota, Florida.[3] George W. Dietrich is Bobcat's Chief Executive Officer. His son, William "Billy" Dietrich, is the President.[4]

The Company, founded in 1953, specializes in residential and commercial waste management systems and services.[5] On December 31, 2012, Begley and Davison each acquired 37.5% of the Company's outstanding equity from Smith, who retained 25% of the equity interest.[6] Begley and Davison financed their combined purchase price of $25,000,000 through a loan from Union Bank, N.A., to be repaid

---

[3]     Pl. and Countercl. Def.'s Opening Br. in Supp. of its Mot. for Partial Summ. J., at 5 [hereinafter "Pl.'s Br."].

[4]     *Id.*, at 5–6. To avoid confusion, this opinion may on occasion refer to either of the Messrs. Deitrich by his first name. No disrespect of familiarity is intended.

[5]     Second Am. Compl. ¶¶ 22–23.

[6]     *Id.* ¶ 24.

in installments of approximately $400,000 per month from the Company's post-acquisition revenues.[7]

At the time of this 2012 purchase, the Company ran a waste management business in Fort Hood, Texas ("Ft. Hood Business").[8] In 2014, the Company was chosen by Memphis, Tennessee as its waste management contractor.[9] Also in 2014, the Company executed an asset swap agreement with a competitor to obtain the right to service the City of Germantown, Tennessee—a Memphis suburb.[10]

In the Summer of 2015, Inland contemplated the sale of the Company and retained an investment banking firm, Livingstone Partners LLC ("Livingstone"), to help the Company.[11] Later that year, Livingstone complied and Inland issued an Information Memorandum to prospective buyers, including Bobcat.[12] In that Information Memorandum, Inland represented, among other things, that: (1) the Company's model was superior in generating Earnings Before Interest, Tax,

---

[7]     *Id.*

[8]     Pl's Br. Ex. A Unit Purchase Agreement [hereinafter "UPA"] § Definition (ffff) "Ft. Hood Business."

[9]     Second Am. Compl. ¶ 32.

[10]     *Id.* ¶ 35.

[11]     Defs.' Answer to Second Am. Compl. And Countercls. Against Countercl. Def. Bobcat [hereinafter "Answer & Countercls."] ¶ 28.

[12]     *Id.* ¶ 29.

Depreciation, and Amortization ("EBITDA"); and (2) the Company had EBITDA margins of 35% from 2011 through 2015.[13]

## B. BOBCAT'S ACQUISITION OF THE COMPANY AND THE UPA.

After receiving the Information Memorandum, Bobcat contacted Inland, and in January 2016, the parties signed a formal letter of intent and commenced negotiations.[14] The acquisition was finalized on May 18, 2016, when Bobcat and Inland entered into a Unit Purchase Agreement ("UPA"). Through the UPA, Bobcat purchased, at a price of $64,900,000: (a) 100% interest in Inland Solutions from the Sellers; and (b) 100% interest in ABC and Inland Service from Inland Holdings (exclusively owned by the Sellers) (the "Transaction").[15]

At the time of the Transaction, the Company maintained operations in ten states: Arkansas, Delaware, Georgia, Kansas, Mississippi, Missouri, Oklahoma, Tennessee, Texas, and Wisconsin.[16]

As part of the Transaction, the Sellers collectively received 11.9% equity ownership interest (the "Rollover Equity") of Bobcat through RSMDBB. RSMDBB

---

[13]    *Id.* ¶ 30.

[14]    *Id.* ¶ 114.

[15]    Second Am. Compl. ¶ 1; UPA §§ 1, 3.

[16]    *Id.* ¶ 22.

was formed specifically to hold this Rollover Equity.[17] The Rollover Equity was subject to redemption by Bobcat after Closing if Inland failed to meet certain financial performance targets tied to proposed expanded service contracts with Memphis ("Memphis Expansion").[18]

Under the UPA, Bobcat and Inland were bound by covenants to the other concerning their post-closing arrangements[19] including, at issue here, Inland's obligation of confidentiality and non-disparagement.[20]

## C. BOBCAT DISCOVERS INLAND'S ALLEGED MISCONDUCT AND MISREPRESENTATION POST-CLOSING.

Shortly after the closing of the Transaction, Bobcat says it discovered Inland's misconduct, misrepresentation, fraud, and mismanagement of the Company.[21] Among other things, Bobcat learned that: (1) the Memphis service contracts operated at a loss of over $1 million;[22] (2) numerous claims had been filed against the Company resulting in liquidated damages of $406,000 for uncured violations that

---

[17] Second Am. Compl. ¶ 15; Answer & Countercls. ¶ 15; UPA § 2.2.

[18] UPA § 6.12(b).

[19] Answer & Countercls. ¶¶ 18–26; UPA § 6.

[20] Answer & Countercls. ¶ 22; UPA § 6.4.

[21] Second Am. Compl. ¶¶ 143–61.

[22] *Id.* ¶ 152.

occurred in 2016 alone;[23] and, (3) the Company failed to properly maintain its trucks and equipment.[24] Bobcat found too that the Company was faced with liquidated damages in Delaware and had already lost certain Delaware business via reassignment to a competitor.[25] Further, Bobcat discovered what appeared to be intentional irregularities in the Company's pre-closing booking of ordinary expenses.[26]

### D. INLAND FLORIDA AND ITS LOST CONTRACT WITH OKALOOSA.

In September 2016, while Bobcat was investigating the Company's suspected non-compliance with the UPA, Begley and Davison formed Inland Florida in contemplation of bidding for a waste management contract with the Board of County Commissioners for Okaloosa County, Florida.[27] The Okaloosa Board had earlier published a request for proposals.[28] And, on November 10, 2016, Inland Florida, with Begley and Davison as its founders, submitted a proposal to the Okaloosa Board.[29] Among other complained-of misconduct, Begley and Davison allegedly

---

[23]     *Id.* ¶ 150.

[24]     *Id.* ¶ 145.

[25]     *Id.* ¶ 153.

[26]     *Id.* ¶ 155.

[27]     *Id.* ¶ 177.

[28]     *Id.* ¶ 174.

[29]     *Id.* ¶ 181.

used UPA-protected confidential information—*e.g.* pricing, names, addresses, and contract terms and conditions of the Company's customers—to boost Inland Florida's credentials.[30]

Before the Okaloosa Board made its final decision, Billy Dietrich sent its members an email objecting to Inland Florida's use of Bobcat's confidential information.[31] The Okaloosa Board ultimately selected another contractor in February 2017.[32] Four months later, this action ensued. And before the Court now is Bobcat's Motion for Partial Summary Judgment through which seeks to knock out some of Inland's counterclaims.

## III. STANDARD OF REVIEW

"The standard of review on a motion for summary judgment is well-settled."[33] A motion for summary judgment is reviewed by this Court under Superior Court Civil Rule 56(c), which states:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine

---

[30] *Id.* ¶¶ 183–84.

[31] *Id.* ¶ 192.

[32] *Id.* ¶¶ 193–94.

[33] *Pazuniak Law Office LLC v. Pi-Net Int'l, Inc.*, 2017 WL 3701031, at *1 (Del. Super. Ct. Aug. 25, 2017).

issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.[34]

The burden is on the moving party to demonstrate its prayer for summary judgment is supported by undisputed facts or an otherwise adequate factual record to support a legal judgment.[35] "If the motion is properly supported, then the burden shifts to the non-moving party to demonstrate that there are material issues of fact for resolution by the ultimate fact-finder."[36]

The Court may grant a motion for summary judgment when: "(1) the record establishes that, viewing the facts in the light most favorable to the nonmoving party, there is no genuine issue of material fact, and (2) in light of the relevant law and those facts, the moving party is legally entitled to judgment."[37] But the Court cannot grant a motion for summary judgment "[i]f . . . the record reveals that material facts are in dispute, or if the factual record has not been developed thoroughly enough to allow the Court to apply the law to the factual record . . . ."[38]

---

[34]     Del. Super. Ct. Civ. R. 56(c).

[35]     *See CNH Indus. Am. LLC v. Am. Cas. Co. of Reading*, 2015 WL 3863225, at *1 (Del. Super. Ct. June 8, 2015).

[36]     *Id.*

[37]     *Haft v. Haft*, 671 A.2d 413, 414–15 (Del. Ch. 1995) (citing *Burkhart v. Davies*, 602 A.2d 56, 58–59 (Del. 1991)). *See also Brooke v. Elihu-Evans*, 1996 WL 659491, at *2 (Del. 1996) ("If the Court finds that no genuine issues of material fact exist, and the moving party has demonstrated his entitlement to judgment as a matter of law, then summary judgment is appropriate.").

[38]     *CNH Indus. Am. LLC*, 2015 WL 3863225, at *1.

A fact is material if it might affect the outcome of the pled claim under the law governing such a claim.[39] In considering a motion for summary judgment, the Court's principle function is to examine the record to determine whether genuine issues of material fact exist, but not to decide such issues.[40]

At bottom, a claim "should be disposed of by summary judgment whenever an issue of law is involved and a trial is unnecessary."[41]

## IV. DISCUSSION

Bobcat moves for partial summary judgment asking the Court to: (1) declare that that the Rollover Equity has been redeemed; (2) find Inland's breach of the confidentiality agreement of the UPA; and (3) dismiss Inland's counterclaims for tortious interference with prospective business relationship and defamation based on Billy Dietrich's email to the Okaloosa Board.

---

[39] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."). *See also In re Asb. Litigation*, 2006 WL 3492370, at *3 (Del. Super. Ct. Nov. 28, 2006); *Farmers Bank of Willards v. Becker*, 2011 WL 3925428, at *3 (Del. Super. Ct. Aug. 11, 2011).

[40] *Merrill v. Crothall-American Inc.*, 606 A.2d 96, 99-100 (Del. 1992) (internal citations omitted).

[41] *Jeffries v. Kent Cty. Vocational Tech. Sch. Dist. Bd. of Educ.*, 743 A.2d 675, 677 (Del. Super. Ct. 1999).

-10-

## A. BOBCAT'S COUNT V—DECLARATORY JUDGMENT ON THE ROLLOVER EQUITY.

In Count V, Bobcat claims that because the Memphis Expansion did not occur, Bobcat is entitled to redeem the Rollover Equity and a repayment of $530,000 from RSMDBB.[42] Bobcat moves now for a declaratory judgment on that count.

Bobcat avers that, pursuant to the UPA's Section 6.12, redemption became "automatic" when Inland failed to deliver the Memphis Expansion. According to Bobcat, the Memphis Expansion is an "exclusive" condition triggering redemption "without regard to cause."[43] Inland all but admits that the Memphis Expansion did not occur; and Inland does not contest Section 6.12's language.[44] But Inland counters with affirmative defenses of prevention of performance and impossibility/impracticability.[45] Inland additionally suggests that the presently incomplete factual record—which it says should be further developed through discovery—prevents entry of such a declaration now.[46] The parties' post-argument

---

[42] Second Am. Compl. ¶¶ 257–59.

[43] Pl. and Countercl. Def.'s Reply Br. in Supp. of its Mot. for Partial Summ. J., at 16 [hereinafter "Pl.'s Reply"] ("Section 6.12's return of the Rollover Equity and the $530,000 prepayment is conditioned exclusively on the occurrence or nonoccurrence of the Memphis Expansion, without regard to cause, showing the Sellers assumed all risks of non-occurrence.").

[44] Answer & Countercls. ¶ 163.

[45] Defs. And Countercl. Pls.'s Br. in Opp'n to Pl./Countercl. Def.'s Mot. for Partial Summ. J, at 3, 15-22 [hereinafter "Defs.' Opp'n"].

[46] *Id.*, at 22–24.

-11-

submissions have further developed their positions on Inland's affirmative defenses.[47]

### 1. Construction of Section. 6.12 of the UPA.

Section 6.12 of the UPA, titled "Memphis Expansion—Redemption and Memphis Payment", reads in pertinent part:

> (a) Memphis Expansion
>    (i) . . . Begley shall have the authority to exclusively negotiate . . . execute . . . Memphis Contract[;]
>    (ii) . . . Davison shall manage the Memphis Expansion in the normal course of business, consistent with past practices . . .[48]

Section 6.12 continues: if the Memphis Expansion does not occur, the Rollover Equity "will *automatically and without further deed or action by any party* be cancelled and redeemed by [Bobcat]. . ."[49] In addition, "[Begley and Davison]

---

[47] Bobcat says Inland's affirmative defenses are contract defenses that are inapplicable to a declaratory judgment action. Bobcat goes on that even if those defenses are conceptually applicable, Inland assumed the risk under the UPA—namely, the risk that the Memphis Expansion might not occur. *See* Pl.'s Reply, at 12–18. During oral argument on this motion Inland brought up cases never mentioned in its briefing to support its position that contract defenses can be applied to declaratory actions. *See* Official Tr. for Oral Argument held on Jan. 4, 2019, at 41-43, 83 [hereinafter "O.A. Tr."] (D.I. 108); Power Point Presented to the Court by Defendants and Counterclaims Plaintiffs during the Jan. 4, 2019 Hearing, at 12-13 [hereinafter "Defs.' Power Point"] (D.I. 105). The Court allowed Bobcat an opportunity to respond to Inland's newly cited authorities and Bobcat did. *See* Letter to The Honorable Paul R. Wallace from Christopher M. Foulds Regarding Bobcat North America, LLC's Response to the Authorities from the Jan. 4, 2019, Oral Argument [hereinafter "Pl.'s Sur Reply"] (D.I. 107). The Court has now considered both the original and supplemental authorities cited by the parties.

[48] UPA § 6.12(a).

[49] *Id.* § 6.12(b) (emphasis added).

-12-

shall pay to [Bobcat] . . . an inversely proportionate amount of the Base Memphis Payment. . ."[50] The "Base Memphis Payment" is $530,000.[51]

Delaware law governs the UPA.[52] And under Delaware law, "[t]he proper construction of any contract is purely a question of law."[53] The objective is to give effect to the parties' mutual intent at the time of contracting.[54] Absent ambiguity, contract terms should be accorded with their plain, ordinary meaning.[55] A contract term is not ambiguous merely because the parties dispute its meaning.[56] Ambiguity exists when the disputed term "is fairly or reasonably susceptible to more than one meaning."[57]

---

[50]     *Id.* § 6.12(c).

[51]     *Id.* § 10.17 (Definitions(t)).

[52]     UPA § 10.6 (Laws Governing Agreement; Consent to Jurisdiction; No Jury Trial).

[53]     *Exelon Generation Acquisitions, LLC v. Deere & Co.*, 176 A.3d 1262, 1263 (Del. 2017). *See also Eagle Force Hldgs., LLC v. Campbell*, 187 A.3d 1209, 1212 (Del. 2018) ("Whether [a] contract's material terms are sufficiently defined is mostly, if not entirely, a question of law."); *O'Brien v. Progressive N. Ins. Co.*, 785 A.2d 281, 286 (Del. 2001) ("[T]he interpretation of contractual language … is a question of law.").

[54]     *Exelon Generation Acquisitions*, 176 A.3d at 1263; *Salamone v. Gorman*, 106 A.3d 354, 367–68 (Del. 2014) (construing a contract's language should adhere to what "would be understood by an objective, reasonable third party.").

[55]     *Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385 (Del. 2012).

[56]     *Id.*

[57]     *Id.*

Here, the Court finds Section 6.12's language clear and unambiguous and, therefore, accords its terms with their plain and ordinary meaning. That ordinary meaning is: with respect to the Memphis Expansion, "[f]rom and after the Closing," Begley was to exclusively negotiate contracts for the Memphis Expansion, and if a contract is executed, Davison was to manage its operation in the normal course of business.

The deliberately selected word "automatically," and phrase "without further deed or action," unambiguously states that the Rollover Equity is tied to, and *only* to, the Memphis Expansion.

### 2. *Contract Defenses Can Be Applied to a Declaratory Judgment Action.*

Turning to Inland's affirmative defenses, the first question answered must be: Are contract defenses—like prevention and impossibility/impracticality—available in a declaratory judgment action? They can be.

Contract defenses do not apply to equitable claims, only legal claims. But a declaratory judgment action is not *per se* equitable.[58] So there is occasion where the Court must determine whether a given declaratory judgment action is one in law or

---

[58]     *Kraft v. WisdomTree Investments, Inc.*, 145 A.3d 969, 985 (Del. Ch. 2016) ("A declaratory judgment is a creature of statute and 'not a purely equitable remedy.'") (quoting *Prestancia Mgmt. Gp., Inc. v. Va. Heritage Found., II LLC*, 2005 WL 1364616, at *7 (Del. Ch. May 27, 2005)).

one in equity.[59] That determination turns on factors such as the nature of the underlying claim,[60] other accompanying requested relief, and the essence of the declaration sought.[61]

Here, Bobcat's declaratory claim is based solely on a contract provision: the construction and application of Section 6.12. This claim bears little difference, if anyl, from, for instance, a potential breach-of-contract claim alleging Inland failed to return the Rollover Equity as required by the contract.[62] Bobcat's declaratory judgment claim is legal in nature; Bobcat concedes as much.[63] Therefore, contract

---

[59] *Id.* ("Whether a declaratory judgment is legal or equitable in nature depends on the underlying subject matter.").

[60] *Id. E.g., Eluv Hldgs. (BVI) Ltd. v. Dotomi, LLC*, 2013 WL 1200273, at *5 (Del. Ch. Mar. 26, 2013) (concluding that declaratory judgment to establish share ownership was based on a claim that was functionally equivalent to breach of contract, therefore, statute of limitations defense was applicable by analogy).

[61] *See e.g., Kraft*, 145 A.3d at 985–86 (finding the declaratory action is legal in nature after concluding the underlying claim, based on Delaware constitution and DGCL, is legal in nature); *Eluv*, 2013 WL 1200273, at *5 (applying the statute-of-limitation defense to a declaratory judgment claim by analogy after concluding that the claim is legal in nature); *E. Shore Envtl., Inc. v. Kent Cty. Dep't of Planning*, 2002 WL 244690, at *4 (Del. Ch. Feb. 1, 2002) (finding equitable jurisdiction to issue declaratory judgment because ultimate remedy being sought was an injunction); *Highlights for Children, Inc. v. Crown*, 193 A.2d 205, 206 (Del. Ch. 1963) (finding equitable jurisdiction over claim for declaratory judgment that shares were invalid, because "the court must consider what plaintiff's complaint really seeks" beyond the face of the complaint); *Diebold Computer Leasing, Inc. v. Commercial Credit Corp.*, 267 A.2d 586, 591 (Del. 1970) (noting that the Court of Chancery has jurisdiction "if there is any underlying basis for equity jurisdiction measured by traditional standards" and finding such a basis existed because "ultimate coercive relief would be injunctive").

[62] *See, e.g., Eluv*, 2013 WL 1200273, at *5.

[63] Pl.'s Sur Reply, at 3 ("Nor does [Bobcat] dispute that its request for a declaration is based on contract (as it requires the Courts to interpret Section 6.12)."). *See also* O.A. Tr., at 7–8 (admitting that prevention can be a defense "under a certain set of facts not present here, yes.").

defenses, including the prevention and impossibility/impracticality Inland asserts here, are conceptually applicable.

### 3. Inland's Defense of Prevention of Performance.

Inland's defense of prevention of performance runs as follows: Bobcat's poor performance with Memphis "prevented" Begley from expanding the Memphis contract. But Bobcat says this prevention defense cannot defeat summary judgment here because Inland assumed the risk that the Memphis Expansion might not occur. Inland disagrees, arguing that assumption of risk requires the contract language to be explicit and Section 6.12's is not.

The general rule concerning a condition precedent is that one has no duty to perform until the condition occurs.[64] And under the "prevention doctrine" a duty to perform is excused if the other promisor party *wrongfully prevented* the condition from occurring.[65] "The key operative language . . . [is] 'wrongfully prevented.'"[66] Because "there is no prevention claim "where the contract, in effect, authorizes

---

[64]     *Dist.-Realty Title Ins. Corp. v. Ensmann*, 767 F.2d 1018, 1023 (D.C. Cir. 1985).

[65]     *A.I.C. Ltd. v. Mapco Petroleum Inc.*, 711 F. Supp. 1230, 1238 (D. Del. 1989) (quoting *Mobile Commc'ns Corp. of Am. v. Mci Commc'ns Corp.*, 1985 WL 11574, at *4 (Del. Ch. Aug. 27, 1985)).

[66]     *Id.* at 1238 n. 24 (D. Del. 1989). *See also Shear v. Nat'l Rifle Ass'n of Am.*, 606 F.2d 1251, 1255 (D.C. Cir. 1979) ("This doctrine provides that when a promisor wrongfully prevents a condition from occurring that condition is excused.").

-16-

prevention."[67] The essential inquiry is whether or not the contract allocated the risk of the condition's nonoccurrence.[68]

Delaware and other courts have long-recognized the prevention doctrine and its assumption-of-risk exception. Courts have found that contracts may authorize prevention via explicit language such as "for any reason,"[69] "for any reasons whatsoever,"[70] "regardless of the circumstances giving rise to such condition,"[71] or "nothing [therein] requires" the agreed-upon condition precedent be consummated.[72]

---

[67] *Shear*, 606 F.2d at 1256 *Kraft*, 145 A.3d at 985–86 (finding the declaratory action is legal in nature after concluding the underlying claim, based on Delaware constitution and DGCL, is legal in nature) (quoting 3A Corbin on Contracts §767, 545) ("The assumption of risk exception recognizes that "there are some cases in which some sort of prevention or interference is contemplated by the parties as quite proper and within the privileges of the promisor.").

[68] *Dist.-Realty Title Ins.*, 767 F.2d at 1023–24 (finding that the contract, by stating "the funds would be returned [] if settlement did not occur 'for no reason,'" the contract allocated the risk of nonsettlement to the developer of the real estate, and concluding that "there is no prevention.").

[69] *Id.*

[70] *Dixon v. Bernstein*, 182 F.2d 104, 104–05 (D.C. Cir. 1950) (contract stating real estate buyer reserved the right to withdraw "for any reasons whatsoever.").

[71] *In re Gulf Oil/Cities Serv. Tender Offer Litig.*, 725 F. Supp. 712, 737 (S.D.N.Y. 1989) (Under governing Delaware law, the court found that where a contract states "regardless of the circumstances giving rise to such condition (including any action or inaction by the Purchaser or Gulf)," the contract "clearly warns plaintiffs that defendants could exercise this option out regardless of the circumstances and regardless of what actions defendants had taken or not taken[.]").

[72] *A.I.C. Ltd. v. Mapco Petroleum Inc.*, 711 F. Supp. 1230, 1238–39 (D. Del. 1989), *aff'd*, 888 F.2d 1378 (3d Cir. 1989) (Applying Delaware law to a claim arising from a consulting agreement that explicitly provided that "nothing [therein] requires [Mapco] to enter into any agreement…to sell any or all of its [assets,]" the court concluded that the claimant "assumed the risk that Mapco would opt not to form the contemplated asset sale transaction.").

Contract language that is less explicit has also been found to authorize prevention by a contracting party or other. Frequently, these contract terms condition the consummation of a transaction upon the approval of the other party,[73] or subject one party to the discretion, satisfaction, or decision of the other party or a third-party.[74]

---

[73] *Mobile Commc'ns Corp. of Am. v. MCI Commc'ns Corp.*, 1985 WL 11574, at *4 (Del. Ch. Aug. 27, 1985) (contract provided that "the consummation of the transactions ... shall be subject to…(iii) the approval of the boards of directors of MCCA and MCI." The court concluded that "MCCA knew that board approval was a condition…MCCA assumed the risk that the MCI board would disapprove the transaction.").

[74] *See, e.g., Cont'l Advisors S.A. v. GSV Asset Mgmt., LLC*, 2015 WL 7720752, at *3 (N.D. Cal. Nov. 30, 2015) (Applying Delaware law and finding where the contract stated the defendant broker "is not obligated to compensate" plaintiff advisor if the transaction is not consummated or if defendant unilaterally rejects the offer, the plaintiff "assumed the risk that the condition precedent would not occur for any number of reasons outside of their control."); *Robert Wood Johnson Univ. Hosp. at Hamilton, Inc. v. SMX Capital, Inc.*, 2013 WL 4510005, at *1–2, (D.N.J. Aug. 26, 2013) (Under the contract, the parties' rights and obligations to perform were subject to five conditions precedent—three of which required the defendant to receive evidence and certain confirmations "satisfactory to" the defendant; one of which required an interconnection agreement "reasonably acceptable to" the defendant. Accordingly, the court found that the claimant "assumed the risk that the conditions precedent will be prevented."); *Lilly v. Envoy, LLC*, 2016 WL 7375271, at *7–8 (W.D. Wash. Dec. 20, 2016) (Applying Delaware law, and holding that where the Stock Purchase Agreement provided "[buyer] will have the authority and freedom to operate the Business and the Company following the date hereof without limitation under this Agreement," plaintiffs had assumed the risk that defendant-buyer would not run the business in a way that allowed them to fulfill milestone objectives that would otherwise entitled plaintiffs to an earn-out payment); *Doherty v. Am. Home Prod. Corp.*, 216 F.3d 1071 (2d Cir. 2000) (Applying Delaware law to a claim for the exercise of stock options brought by at-will employees against the employer company under option plans, the court affirmed that the "[employees] assumed the risk in the Option Plans that their right to exercise their options would be shortened or eliminated by their termination from an action by [employer], and as at-will employees they assumed the risk that they could be terminated without cause…Thus, the prevention doctrine does not apply."). *But cf. Lieber v. Morton-Norwich Prods., Inc.*, 1978 WL 1117, at *2 (S.D.N.Y. Sept. 29, 1978) (Under Delaware law, a stock option agreement required continuous employment with the subsidiary which was terminated by the sale of the subsidiary at the election by the parent company. The court held that the sale of the subsidiary by the defendant parent company did not excuse plaintiffs at-will employees from compliance with the express terms of the options that required them to be employed with the subsidiary for one year.); *Slamecka v. Empire Kosher Poultry, Inc.*, 290 F.

The fact that both contracting sides are sophisticated parties experienced in their industry, weighs in favor of finding an assumption of risk in contract terms.[75] But where assumption of risk is found in a contract, courts caution that the specific risk assumed must be distinguished from some "blanket" assumption of risk claimed.[76] For only a specific risk clearly assumed by a party will preclude that party's defensive claim of prevention.[77] And absent clear contractual authorization

---

Supp. 2d 934, 938 (N.D. Ill. 2003) (applying Illinois law's agency principle to a broker-seller relationship with respect to the broker's commission fees (as oppose to Delaware law's approach of treating such relationships as contract law), the court denied the defendant's argument to defeat plaintiff's prevention claim based on plaintiff's assumption of risk, reasoning that Illinois law requires "[t]he commission is earned even though no enforceable contract to purchase is ever formed and no sale is consummated, if, in fact, the failure to contract or consummate is wholly attributable to the seller.").

[75] *See, e.g., Cont'l Advisors*, 2015 WL 7720752, at *5 (Applying Delaware law, the court found assumption of risk, in part, based on the reason that "Plaintiffs are apparently savvy financial organizations, capable of facilitating deals of hundreds of millions of dollars."); *Dixon*, 182 F.2d at 105 (Noting in a suit by a real estate broker against a buyer arising from the commission fees, "these are dealings between informed parties").

[76] *Shear*, 606 F.2d at 1253, 1256 (In a dispute by real estate agent, Shear, against the buyer, NRA, for buyer's disapproval of a sale that resulted in Shear not getting paid for his commission, the court considered NRA's Management Committee's procedure that "the winning bid would...be unanimously recommended by the Management Committee to the Board of Directors." The court concluded that pursuant to the terms of the contract, Shear assumed the risk "that the Board...would withhold approval despite the unanimous recommendations of the Management Committee," but "did not assume the risk that the Management committee would refuse to recommend the contract, or that the Board would be deprived by a subsequently enacted by-law of [the] authority to approve the contract.").

[77] *See, e.g., id.; Haft v. Dart Group Corp.*, 877 F. Supp. 896, 903 (D. Del. 1995) (applying prevention doctrine when employer wrongfully dismissed fixed-term contract employee without cause, and holding that the employee cannot be denied of his stock option rights. The court found it "inconceivable" the proposition "that an employee would contract with his employer and assume the risk of losing his stock options if the employer terminated him without cause."); *W & G Seaford Assocs., L.P. v. E. Shore Markets, Inc.*, 714 F. Supp. 1336, 1341–42 (D. Del. 1989) (finding assumption of risk inapplicable to the prevention argument because nothing in the agreement

of prevention (like that just described above), a court won't judicially imply such a term.[78]

Turning to Inland's prevention defense, the Court finds Inland indeed assumed the risk that the Memphis Expansion might not occur. Section 12.6 of the UPA explicitly provides that if the Memphis Expansion does not occur, the Rollover Equity "will *automatically and without further deed or action by any party* be cancelled and redeemed by [Bobcat.]"[79] The ordinary meaning and common understanding of the word "automatically" pertinent here is "in a manner independent of a decision or action"[80] This use of "automatically" in this contract, is reinforced by its next contractual phrase "without further deed or action by any party." And these words and phrases—included in this multimillion-dollar agreement that was forged by sophisticated parties—in all meaningful ways equate to "for any reason whatsoever," and "regardless of the circumstances giving rise to such condition."

---

"states that either party assumed the risk that the conditions would not occur. Nor can such a term be implied.").

[78] *W & G Seaford Assocs., L.P.*, 714 F. Supp. at 1341–42 (finding assumption of risk inapplicable to the prevention argument because nothing in the agreement "states that either party assumed the risk that the conditions would not occur. Nor can such a term be implied.").

[79] UPA § 6.12(b) (emphasis added).

[80] *Automatically*, DICTIONARY.COM, http://www.dictionary.com/browse/automatically (last visited Apr. 25, 2019).

In unambiguously and painstakingly drafted language, Section 6.12 confers the automation of the redemption that hinges solely on the nonoccurrence of a predetermined event, here, the Memphis Expansion. By executing the UPA, Inland knowingly consented to the risk that the Memphis Expansion might not occur, and that if it did not occur, the Rollover Equity would automatically be redeemed, without regard to the cause of the nonoccurrence.[81] So Inland's prevention defense is foreclosed by its own knowing assumption of risk.

### 4. Inland's Defense of Impossibility / Impracticality

Inland also asserts the defense of impracticability/impossibility of performance on the same basis as the prevention doctrine: Bobcat's poor performance made it impossible to expand the business with Memphis.[82]

---

[81] Inland continues to argue, of course, that it did not assume the risk that the Memphis Expansion wouldn't occur. Rather, Inland insists "that the parties assumed the expansion would occur," and it could "not expect[] that Bobcat would change Memphis's mind so quickly." Defs.' Power Point at Slides 23; O.A. Tr. at 48–49. According to Inland, only language as explicit as "if the Memphis Expansion does not occur, the [R]ollover [E]quity is redeemed" would do. *See id.* Slides 22–23; O.A. Tr. at 45–46 (assumption-of-risk exception "only applies where the contract contains express language authorizing the prevention of performance.") Not so. Having surveyed a broad range of decisions applying Delaware law, the Court observes that finding a party has contractually assumed a risk (and is, therefore, precluded from asserting prevention) is not always based on some set incantation of express contractual authorization. Courts have found contracted risk assumption based on varying contract language, as well as, reasonable commercial common sense. Thus, Inland's argument attempting to so narrow the application of the assumption-of-risk exception is rejected.

[82] Defs.' Opp'n, at 20–22.

-21-

Under Delaware law, an impracticability/impossibility defense requires the showing of "(1) the occurrence of an event, the nonoccurrence of which was a basic assumption of the contract; (2) the continued performance is not commercially practicable; and (3) the party claiming impracticability did not expressly or impliedly agree to performance in spite of impracticability that would otherwise justify nonperformance."[83]

Where the party has assumed the risk that the "impracticable/impossible" event might occur, the defense does not apply.[84] There can be no invocation of the impossibility defense if "the supervening events were 'reasonably foreseeable, and could and should have been anticipated by the parties and provision made therefor within the four corners of the agreement.'"[85]

Here, the sophisticated commercial parties, Bobcat and Inland, no doubt foresaw that the Memphis Expansion simply might not occur for any number of

---

[83] *Chase Manhattan Bank v. Iridium Africa Corp.*, 474 F. Supp. 2d 613, 620 (D. Del. 2007) (concluding that the defendants are precluded from raising the impracticability defense).

[84] *In re Bicoastal Corp.*, 600 A.2d 343, 351 (Del. 1991) (finding that the parties expressly "provided for the contingency that Bicoastal might fail to redeem the junior preferred stock by the mandatory redemption date," and holding that the impossibility doctrine "does not excuse nonperformance where the promisor has indicated an intent to assume the risk.").

[85] *Williams Nat. Gas Co. v. Amoco Prod. Co.*, 1991 WL 58387, *13 (Del. Ch. Apr. 16, 1991) ("The doctrine of commercial frustration does not apply if at the time of contracting the supervening events were 'reasonably foreseeable, and could and should have been anticipated by the parties and provision made therefor within the four corners of the agreement.'") (quoting *Columbian Nat. Title Ins. Co. v. Twp. Title Servs., Inc.*, 659 F. Supp. 796, 804 (D. Kan. 1987)).

reasons or no reason at all. It is the very risk Section 6.12 contractually allocates. Had Inland intended to place any limitation on the "automatic" redemption, it could have done so. Having consented to taking on the potentiality that Memphis would not expand its relationship—no matter what, and with no limitation—Inland cannot retroactively avoid the consequence of that now-materialized risk.

Thus, given the simple interpretation of the UPA's unambiguous language, Inland's affirmative defenses of prevention and impracticability/impossibility must be rejected as a matter of law. The Court need not consider Inland's calls for additional discovery or suggestions that material factual disputes exist. The Court **GRANTS** Bobcat's motion for summary judgment on the claim to redeem the Rollover Equity and the recoupment of the $530,000 Base Memphis Payment.

## B. Bobcat's Count III—Breach of the Confidentiality and Non-Disclosure Obligations by Inland under § 6.4(a) of the UPA.

Bobcat next moves for summary judgment on its claim that Inland breached the confidentiality obligation found in Section 6.4(a) of the UPA. Bobcat says Inland Florida improperly used "confidential information" without authorization in its bid for the waste management contract with the Okaloosa Board.[86] Specially,

---

[86] Pl.'s Br., at 30–35.

Bobcat claims that Inland Florida improperly (and misleadingly) used the names, addresses, and other contract information of the Company's customers.[87]

Section 6.4(a) consists of four sentences. They are broken down as follows:

First sentence: (a) . . . for a period of five (5) years after the Closing Date, [Inland Holding] and each Member shall not . . . disclose to any person any *confidential information* concerning the *Business*, Facilities, Equipment, Material Contracts, *customers*, Permits or the Company Group.

Second sentence: [Inland Holding] and each Member[88] *further agrees* that [Inland Holding] and such Member will not disclose the *pricing information, cost structure, customer names or addresses or the terms or conditions*. . .

Third sentence: If [Inland Holding] or any Member becomes legally compelled to disclose such confidential information, [Inland Holding] and/or such Member shall provide [Bobcat] with prompt advance written notice . . .

Fourth sentence: "confidential information" means and includes, without limitation, all Trade Rights . . . all customer lists . . . all other information concerning the *Business* . . . the Company Group's services, *clients, customers*, acquisition prospects, subcontractors, costs, profits, markets, sales, trade secrets, processes, programs, products, marketing and distribution methods, but *shall exclude* any (x) knowledge, data and information that is (i) *generally known or becomes known to the public* (other than as a result of a breach of this Agreement) . . .[89]

---

[87]     *Id.* at 32.

[88]     "Member," as referenced in the UPA, is defined as each of Begley, Davison, and Smith. *See* UPA § Preamble.

[89]     UPA § 6.4(a) (emphasis added).

-24-

The first sentence references "confidential information;" the second sentence uses "further agrees," and specifies five categories of information (*namely*, pricing, cost structure, customers' names, addresses, and contracts' terms or conditions); the third sentence describes the procedure of giving notice when disclosure is legally compelled; and the fourth sentence provides a definition of "confidential information" and exemptions therefrom, *e.g.*, "public information."

Bobcat acknowledges the "public information" exception, and concedes that municipal contract information is largely public.[90] According to Bobcat, the "public information" exception only applies to the "confidential information" referenced in the first sentence, and not the specified categories of information described in the second sentence.[91] So then, says Bobcat, because Inland Florida used items listed in the second sentence, Inland Florida disclosed that not subject to Section 6.4(a)'s "public information" exception.[92] In essence, Bobcat urges the Court to read the

---

[90]  Pl.'s Br., at 31 ("Company's customers are municipalities, making some Company information 'public,' even if not widely known"); O.A. Tr., at 79–81 ("[different] terminology … in the second sentence because they mean something different"); *id.*, at 84–85 ("I don't dispute that some categories of information from municipalities are public information that can be received through FOIA requests.").

[91]  *Id.*, at 31–32.

[92]  *Id.*, at 31–33.

-25-

first and second sentences as creating and imposing two independent, distinct and unrelated confidentiality obligations.[93]

Inland does not dispute that Inland Florida used the Company's customers' names, addresses, and municipal contract information without Bobcat's prior consent.[94] But Inland does contest Bobcat's isolationist reading of Section 6.4(a)'s first two sentences. Inland urges, instead, that the "public information" exception applies to both and its use fell within that exception.[95]

Factually, there is no dispute regarding Inland Florida's use without Bobcat's authorization of information that could "become[] known to the public." But the dispositive question for summary judgment on this claim is narrow and solely one of law: whether Section 6.4(a)'s second sentence imposes a confidentiality obligation unexcepted by the same section's "public information" exception. It does not. As explained below, the second sentence is most naturally read to further describe certain types of protected or "confidential information." In turn, disclosure

---

[93] *Id.* ¶¶ 30–35.

[94] Ex. C to Pl.'s Br., Bart A. Begley's Responses and Objections to Pl. Bobcat's First Set of Requests for Admission [hereinafter "Begley's Responses"] ¶¶ 21–35, 38, 41, 44, 46 (admitting that the City of Augusta, City of Rogers, Outaganie County, City of Dover, and Kent County were not customers of any of Inland Florida, Inland Service, and Inland Holdings). *See also* Ex. D to Pl.'s Br., Montgomery M. Davison's Responses and Objections to Pl. Bobcat's First Set of Requests for Admission [hereinafter "Davison's Responses"] ¶¶ 14–28, 31, 34, 37, 39 (admitting the same).

[95] *See e.g.*, Defs.' Opp'n, at 24–29; Begley's Responses ¶¶ 36–44; Davison's Responses ¶¶ 29–37.

of that described in the second sentence might—depending on the circumstances—fall under Section 6.4(a)'s "public information" exception.

### 1. The First and Second Sentences Create Somewhat Distinguishable but Congruous Confidentiality Obligations.

"The role of a court is to effectuate [contracting] parties' intent."[96] Absent textual ambiguity, the Court accords the contract's language its plain, ordinary meaning.[97] The Court takes a holistic view, reading the given instrument as a whole, giving effect to all of its terms, and reconciling or harmonizing all of its provisions.[98] "[T]he meaning which arises from a particular portion of an agreement cannot control the meaning of the entire agreement where such inference runs counter to

---

[96] *Martin Marietta Materials, Inc. v. Vulcan Materials Co.*, 68 A.3d 1208, 1218 (Del. 2012) (en banc) (citing *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006)).

[97] *Lorillard Tobacco*, 903 A.2d at 739. *See also Exelon Generation Acquisitions*, 176 A.3d at 1263; *Salamone v. Gorman*, 106 A.3d 354, 367–68 (Del. 2014) (construing a contract's language should adhere to what "would be understood by an objective, reasonable third party.").

[98] *See generally E.I. du Pont de Nemours & Co. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del. 1985) ("In upholding the intentions of the parties, a court must construe the agreement as a whole, giving effect to all provisions therein."); *Martin Marietta Materials*, 68 A.3d at 1122–26 (analyzing the language of the Non-Disclosure Agreement holistically by taking into consideration different provisions and noting their relationships with one another); *2009 Caiola Family Trust v. PWA, LLC*, 2014 WL 1813174, at *7 (Del. Ch. Apr. 30, 2014); *Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385–86 (Del. 2012); *Elliott Assoc., L.P. v. Avatex Corp.*, 715 A.2d 843, 854 (Del. 1998).

the agreement's overall scheme or plan."[99]  And the Court must, when construing a contract's terms, avoid absurd, irrational, and illogical results.[100]

Section 6.4(a) is unambiguous so the Court can accord its terms their plain and ordinary meaning.  Section 6.4(a)'s first sentence reads "not. . . disclose to any person any confidential information concerning the Business . . ."  The second sentence requires that the Inland entities "not disclose the [five categories of information] to any person, firm, corporation, association or other entity related to the Business."  That second sentence uses the conjunctive phrase "further agrees," indicating something that is in addition to what has already been said in the first sentence.  Delaware courts traditionally honor the express language of a contract.  And contract construction resulting in superfluous verbiage is strongly disfavored.[101]  Interpreting the second sentence's non-disclosure obligation as fully encompassed within that described in the first sentence would effectively read the second sentence out of Section 6.4(a) all together.  The Court will not do so.

---

[99]    *E.I. du Pont de Nemours & Co.*, 498 A.2d at 1113 ("Moreover, the meaning which arises from a particular portion of an agreement cannot control the meaning of the entire agreement where such inference runs counter to the agreement's overall scheme or plan.").

[100]    *Osborn v. Kemp*, 991 A.2d 1153, 1160–61 (Del. 2010).

[101]    *Khan v. Delaware State Univ.*, 2017 WL 815257, at *4 (Del. Super. Ct. Feb. 28, 2017) ("When interpreting contracts, this Court…gives meaning to every word in the agreement[,] and avoids interpretations that would result in superfluous verbiage.") (internal quotation omitted).

As observed before, the UPA was negotiated and prepared by commercially savvy parties. Their deliberately chosen words in the contract language must be given effect. Thus, reading each sentence individually, and the entire Section 6.4(a) holistically, the Court finds that the second sentence does create a confidentiality obligation that is to some degree distinguishable from that of the first sentence. But that does not end the matter.

### 2. The Confidentiality Obligation Imposed by the Second Sentence is Not Free from the "Public Information" Exception.

Recognizing the difference between the first and second sentences, however, does not mean they are completely isolated and independent. To the contrary, their relationship is that of a general provision and a specific one; between a broad confidentiality obligation and its specific subset.

"Specific language in a contract controls over general language, and where specific and general provisions conflict, the specific provision ordinarily qualifies the meaning of the general one."[102]

Here, the Court finds the specific provision (the second sentence) wholly consistent with the general provision (the first sentence), and in essence, is a subset

---

[102]  *DCV Holdings, Inc. v. ConAgra, Inc.*, 889 A.2d 954, 961 (Del. 2005).

of the general provision. The first sentence's "confidential information" is inclusive of the specified categories of information enumerated in the second sentence.[103]

The second sentence specifically applies to certain categories of persons and information. Under the circumstances where those criteria are met, a claim can be based on the second sentence. The first sentence is a "catch-all" that sets forth a general confidentiality obligation.

Furthermore, the third sentence uses *"such"* confidential information to reference the aforementioned information that immediately precedes "such"—that is, the specific information set out in the second sentence. Given these structural relationships and the plain language of Section 6.4(a), the only reasonable interpretation is that the specific information enumerated in the second sentence further describes, and is exemplary of, some of the "confidential information" referenced more than once elsewhere throughout Section 6.4(a).

It only follows that any exception to the general provision must apply to its subset, *i.e.*, the second sentence's confidentiality obligation is subject to the fourth sentence's "public information" exception to the same extent the first sentence's confidentiality obligation is.

---

[103]  Compare the second sentence's "pricing information, cost structure, customer names, customer addresses and contractual terms," with the first sentence's confidential information that includes "all customer lists...and all other information concerning the Business...and the [Company's] clients, customers...costs, profits, markets, sales..."

Given this construction, Bobcat's motion can only be granted if Bobcat can show on the present record, that Inland Florida used wholly confidential non-public information in violation of Section 6.4(a). Bobcat hasn't done so.

The present record demonstrates that Inland Florida used names, addresses, or other contact information of certain of the Company's municipal customers. Bobcat concedes that at least some of that information is public.[104] And Bobcat provides no affidavits, exhibits, or evidence that otherwise demonstrates what information (if any) is non-public, thus, protected under the confidentiality agreement.

Rather, Bobcat's sole argument rests on its interpretation of Section 6.4(a)—that the second sentence creates an entirely independent confidentiality obligation that cannot be excepted under the fourth sentence. That interpretation just isn't right. Bobcat's motion for summary judgment on Inland's alleged breach of Section 6.4(a) is **DENIED**.[105]

---

[104] Pl.'s Br., at 32; O.A. Tr., at 79–81, 84–85.

[105] Inland furthers alternative arguments to oppose summary judgment, including: (1) Section 6.4(a) does not prohibit disclosure of information to the Okaloosa Board; (2) the language of Section 6.4(a) is ambiguous; and (3) Bobcat fails to allege facts supporting damages. Defs.' Opp'n, at 24, 32–34; O.A. Tr., at 57–69. The Court need not address these alternative arguments.

## C. Counterclaim Count I (Tortious Interference with Prospective Business Relations) and Count III (Defamation) with Respect to Inland Florida.

Bobcat next seeks summary judgment on Inland Defendants' counterclaims of tortious interference and defamation. Both counterclaims arise out of Billy Dietrich's email to the Okaloosa Board concerning Inland Florida's bid proposal.[106] Bobcat invokes the First Amendment-based *Noerr-Pennington* doctrine, claiming that Billy's email is constitutionally privileged petitioning activity.[107] Alternatively, Bobcat contends that summary judgment is warranted under Florida law.[108]

The parties agree that Florida law governs this substantive claim.[109] Even if there was disagreement, the Court would apply Florida law under Delaware's "most significant relationship" test.[110]

---

[106] Inland's tortious interference claim also includes another count based on Billy's email to the Ft. Hood workforce. Bobcat's present motion does not seek summary judgment on that count.

[107] Pl.'s Br., at 35–57.

[108] *Id.*, at 48–54.

[109] *See* O.A. Tr., at 18 (Bobcat conceding that "Florida state law is applicable to the actual claims of the defamation and tortious claims[.]"). *See also* Pl.'s Br., at 36 n.13, 37 ("Moreover, Mr. Dietrich's email was privileged under Florida law…was never defamatory in the first place."); Defs.' Opp'n., at 44 ("Bobcat's arguments…under Florida law fail[.]").

[110] *Eureka Res., LLC v. Range Res.-Appalachia, LLC*, 62 A.3d 1233, 1236 (Del. Super. Ct. 2012) (citing *Travelers Indem. Co. v. Lake*, 594 A.2d 38, 47 (Del. 1991) (adopting the flexible approach of the "most significant relationship" provided in the Restatement (Second) of Conflicts)).

-32-

### *1.* **Noerr-Pennington** *Doctrine Would Likely Not be Applied in a Florida State Tort Action.*

Bobcat first relies on the Constitution-based *Noerr-Pennington* doctrine, contending that Billy's email is protected petitioning activity. Inland contests that the email does invoke the *Noerr-Pennington* doctrine.

#### *i.* Noerr-Pennington *Doctrine Overview*

*Noerr-Pennington* immunity is rooted in the First Amendment to the United State Constitution which insures one's "right to petition the government for a redress of grievances."[111] *Noerr-Pennington* first emerged in the antitrust law to immunize individual or concerted activity designed to influence legislation that might result in trade restrictions or monopolies as a consequence of legislative activity.[112] The motive for such communication to the goverment was deemed by the Court to be

---

[111] U.S. Const. Amend. I.

[112] The *Noerr-Pennington* doctrine is named after the two landmark cases: *Eastern Railroad Presidents Conference v. Noerr Motor Freight Inc.*, 365 U.S. 127 (1961), and *United Mine Workers v. Pennington*, 381 U.S. 657 (1965).

irrelevant.[113]  And *Noerr-Pennington* immunity has since been extended to administrative and judicial actions.[114]

That immunity, however, is not limitless.[115] *Noerr-Pennington* applies only to petitioning efforts seeking governmental, not private, action.[116] Petitioning activities that employ unlawful means,[117] or consist of false statements to the government,[118] are not protected. *Noerr-Pennington* immunity is also subject to a

---

[113]  *See Noerr*, 365 U.S. at 139 ("The right of the people to inform their representatives in government of their desires with respect to the passage or enforcement of laws cannot properly be made to depend upon their intent in doing so."); *Pennington*, 381 U.S. at 670 ("Joint efforts to influence public officials do not violate the antitrust laws even though intended to eliminate competition.").

[114]  *California Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972) (holding that *Noerr-Pennington*'s protection of the right to petition "governs the approach of citizens or groups of them to administrative agencies and to courts[.]").

[115]  *Id.* at 512–13, 515 (discussing that the *Noerr-Pennington* immunity does not protect "illegal and reprehensive practices" that may corrupt the judicial process, or deter and harass competitors from having "free and unlimited" access to the agencies and courts, such as perjury, use of a fraudulent patent, illegal conspiracy with a licensing authority, misrepresentation, and bribery).

[116]  *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 499 (1988) (citing *Noerr*, 365 U.S. at 136; *Pennington*, 381 U.S. at 671).

[117]  *F.T.C. v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411, 424–25 (1990) (noting that "the ends do not always justify the means," and distinguishing that *Noerr*'s "restraint of trade was the intended *consequence* of public action" while the boycott activity was "the *means* by which respondents sought to obtain favorable legislation.").

[118]  *California Motor Transp.*, 404 U.S. at 513 ("Misrepresentations, condoned in the political arena, are not immunized when used in the adjudicatory process."). *See also Armstrong Surgical Ctr., Inc. v. Armstrong Cty. Mem'l Hosp.*, 185 F.3d 154, 177 (3d Cir. 1999) ("[M]aterial misrepresentations can vitiate *Noerr–Pennington* immunity."), *accord Cheminor Drugs, Ltd. v. Ethyl Corp.*, 168 F.3d 119, 124 (3d Cir. 1999) ("[A] material misrepresentation that affects the very core of a litigant's [] case will preclude *Noerr–Pennington* immunity."); *Potters Med. Ctr. v. City Hosp. Ass'n*, 800 F.2d 568, 580 (6th Cir. 1986) ("[K]nowingly false submissions or intentional

-34-

"sham litigation" exception.[119] A petitioning activity, although ostensibly directed to influence governmental action, is a "sham" if it is actually designed to interfere with a competitor's business relationships.[120]

The determination of whether a petitioning activity is a "sham" follows a two-step inquiry.[121] First, the litigation must be "objectively baseless" that "no reasonable litigant could realistically expect success on the merits."[122] "[I]f challenged litigation is objectively meritless," the court moves to the second-step inquiry to examine the "litigant's subjective motivation" to determine if the baseless suit conceals an attempt to interfere with a competitor's business through the "use

---

misrepresentations constitute an abuse of government processes."); *St. Joseph's Hospital v. Hospital Corp. of America*, 795 F.2d 948, 955 (11th Cir. 1986) ("Misrepresentations under these circumstances do not enjoy *Noerr* immunity."); *Whelan v. Abell*, 48 F.3d 1247, 1254–55 (D.C. Cir. 1995) (concluding that *Noerr–Pennington* does not protect "knowing misrepresentations to state securities administrators and a federal court."); *Harris v. Adkins*, 432 S.E.2d 549, 552 (W. Va. 1993) ("the right to petition the government [] does not provide an absolute privilege for intentional and reckless falsehoods, but the right is protected by the actual malice standard.").

[119]    *See Noerr*, 365 U.S. at 144; *California Motor Transp.*, 404 U.S. at 515.

[120]    *Noerr*, 365 U.S. at 144. *See also Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc.*, 690 F.2d 1240, 1255 (9th Cir. 1982) (noting that the "sham exception" to *Noerr-Pennington* immunity "reflects a judicial recognition that not all activity that appears as an effort to influence government is actually an exercise of the first amendment right to petition. At times this activity, disguised as petitioning, is simply an effort to interfere directly with a competitor.").

[121]    *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.*, 508 U.S. 49, 60–61 (1993).

[122]    *Id.* at 60.

-35-

[of] the governmental *process*—as opposed to the *outcome* of that process—as an anticompetitive weapon[.]"[123]

### ii. *Inapplicability of* Noerr-Pennington *Doctrine to Inland Defendants' Florida Common Law Based Counterclaims.*

*Noerr-Pennington* doctrine is federally based. Bobcat concedes that Florida state courts have not adopted *Noerr-Pennington* doctrine, but urges that this Court should apply it under the federal Constitution's Supremacy Clause.[124]

Under Delaware's conflict-of-law jurisprudence, Delaware courts are compelled to apply the foreign law as the state courts of the foreign jurisdiction would. And Florida law simply has not adopted—in fact, it has somewhat resisted— the *Noerr-Pennington* doctrine.

Florida appellate courts have not yet recognized any *absolute* privilege assigned to petitioning activities under the First Amendment.[125] Instead, the Florida Supreme Court has observed no need to do so given the "qualified privilege" or "conditioned privilege" under Florida common law that provides wholly adequate

---

[123]     *Id.* at 60–61 (citing *Noerr*, 365 U.S. at 144; *City of Columbia v. Omni Outdoor Advertising, Inc.*, 499 U.S. 365, 380 (1991)(emphasis in original)).

[124]     *See* Pl.'s Br., at 38–39; O.A. Tr., at 21.

[125]     *Fla. Fern Growers Ass'n, Inc. v. Concerned Citizens of Putnam Cty.*, 616 So. 2d 562, 567 (Fla. Dist. Ct. App. 1993) ("The original *Noerr–Pennington* line of cases, then, hardly supports the notion argued by appellees that there exists an absolute privilege for petitioning activities.") (emphasis added), *accord Turkey Creek, Inc. v. Londono*, 567 So. 2d 943, 948 (Fla. Dist. Ct. App. 1990), *approved*, 609 So. 2d 14 (Fla. 1992).

protection of the First Amendment rights of speech, association, and petitioning activities.[126] In doing so, the Florida Supreme Court expressly rejected the "sham" test and made it clear that "the right to petition decisions should adopt analogous speech and association precedents" developed under Florida common law.[127] And so, on Inland Florida's law-based tortious interference and defamation claims, this Court will not (and need not) announce such an unnecessary adoption for Florida state courts, but instead follows first the qualified privilege analysis utilized by them.

### 2. *Inland's Counterclaims for Tortious Interference and Defamation under Florida Law.*

Under Florida law, Bobcat says, Billy's email is conditionally privileged because (i) the communication is to protect Bobcat's legitimate contractual rights, and (ii) is not defamatory.[128] Inland maintains that the email is not privileged, and existing factual disputes preclude summary judgment.[129]

---

[126]    *See Nodar v. Galbreath*, 462 So. 2d 803, 809–10 (Fla. 1984) (finding that a parent's remarks concerning a teacher's performance to the school board were privileged as a matter of law as "statements of a citizen to a political authority."); *Londono v. Turkey Creek, Inc.*, 609 So.2d 14, 18 (Fla. 1992) ("We decline to adopt the 'sham' test because we find that the current law in Florida already provides protection for the First Amendment right to petition the government."); *Fla. Fern Growers Ass'n*, 616 So.2d at 569 (affirming that Florida Supreme Court in *Londono* equated "the limited immunity from suit accorded under the First Amendment" with the "qualified privilege of Florida's common law.").

[127]    *Londono*, 609 So.2d at 18; *Fla. Fern Growers Ass'n*, 616 So.2d at 569.

[128]    Pl.'s Br., at 48–55.

[129]    Defs.' Opp'n, at 44–45.

*i.* *The Court Cannot Find on the Present Record that*
   *Billy's Email is Privileged Communication Immune from*
   *Liability for Tortious Interference.*

With respect to Inland's tortious interference claim, Bobcat contends that the

email is privileged because it asserts Bobcat's right under Section 6.4(a) because

Inland breached the confidentiality agreement.[130]   Inland contends that no valid

contract rights were asserted, and alternatively, factual disputes with respect to

Bobcat's malice and employment of improper means preclude summary

judgment.[131]  Given the record at this point, the Court must agree with Inland.

Under Florida law, "[t]ort liability for interference with prospective

contractual relationships is generally recognized."[132]   An interference can be

immunized from liability where the action "is undertaken to safeguard or promote

one's financial or economic interest,"[133] but not to purposefully cause a breach of

---

[130]   Pl.'s Br., at 49–50.

[131]   Defs.' Opp'n., at 49–51.

[132]   *Monco Enterprises, Inc. v. Ziebart Corp.*, 673 So. 2d 491, 492 (Fla. Dist. Ct. App. 1996).

[133]   *See Barco Holdings, LLC v. Terminal Inv. Corp.*, 967 So. 2d 281, 293 (Fla. Dist. Ct. App. 2007); *Yoder v. Shell Oil Co.*, 405 So. 2d 743, 744 (Fla. Dist. Ct. App. 1981) (holding that the privilege to interfere is not limitless, and the interfering party must "have a financial interest in the business of the third party which is in the nature of an investment."), *rev. denied*, 412 So.2d 470 (Fla. 1982); *Knepper v. Genstar Corp.*, 537 So. 2d 619, 622 (Fla. Dist. Ct. App. 1988) ("A statement is qualifiedly privileged if made by one who has a duty or interest in the subject matter to one who has a corresponding duty or interest.").

contract.[134]   And the claim's target—*i.e.*, he asserting privilege—will bear the burden to show that the claimed interference is privileged or justified.[135]

To be immunized on the basis of privilege, the interfering action must be (1) taken on a privileged occasion, and (2) the privilege may not be abused.[136]  Whether an occasion gives rise to a privilege is a question of law.[137]  Whether the privilege was abused is one of fact reserved for trial.[138]

Florida law "embraces a broad range of the privileged occasions."[139]  But there is an inadequate factual record for the Court to find as a matter of law that Billy's

---

[134]   *Yoder*, 405 So. 2d at 744. *See also Making Ends Meet, Inc. v. Cusick*, 719 So. 2d 926, 928 (Fla. Dist. Ct. App. 1998) (finding that the interfering "actions were sufficiently egregious to overcome the immunity").

[135]   *Monco Enterprises*, 673 So. 2d at 492.

[136]   *Demby v. English*, 667 So. 2d 350, 353 (Fla. Dist. Ct. App. 1995) ("Under Florida common-law principles anyone who publishes defamatory matter is not liable if the remarks are published upon a conditionally privileged occasion and the privilege is not abused."); *Knepper*, 537 So. 2d at 622 ("[W]here a qualified privilege exists, plaintiffs must prove express malice or malice in fact in order to recover.  Express malice, or malice in fact, constitutes an abuse of a qualified privilege leaving the defendant liable.").

[137]   *Nodar*, 462 So.2d at 810 ("the question of whether the occasion upon which they were spoken was privileged is a question of law to be decided by the court.") (citing *Abraham v. Baldwin*, 52 Fla. 151, 42 So. 591 (1906)).

[138]   *Fla. Fern Growers Ass'n*, 616 So. 2d at 569–70 ("[F]actual questions remain whether the mode, manner, or purpose of their communication amounted to abuse or forfeiture of the privilege.").

[139]   The *Nodar* court noted that "[t]he law of Florida embraces a broad range of the privileged occasions that have come to be recognized under the common law," and recognized several examples of those privileges occasions, such as the mutuality of interest between the speaker and listener; discussion of former employee's performance with prospective employers; communications for bona fide commercial purposes to protect the recipient's interest; and

email was communicated on any of the recognized occasions giving rise to privilege under Florida's common law. Moreover, even if the Court could find the email was privileged activity, factual issues exist as to whether Bobcat abused such privilege.[140] Thus, Bobcat's motion for summary judgment on this counterclaim must be **DENIED**.

> ii. *Bobcat's Summary Judgment Motion on Inland's Counterclaim for Defamation Must Also be Denied.*

Turning to Inland's counterclaim for defamation, Bobcat again relies on qualified privilege. And the Court again must find that that privilege-based argument fails here.

Bobcat next argues that Billy's email is not defamatory because it is merely an opinion, and to the extent any factual statements are contained, they are substantially true.[141]

Florida law provides, "[t]o establish a cause of action for defamation, a plaintiff must show that (1) the defendant published a false statement about the plaintiff, (2) to a third party, and (3) the falsity of the statement caused injury to the

---

statements concerning matters of public concern. *See Nodar*, 462 So.2d at 809–10 (citation omitted).

[140] *Fla. Fern Growers Ass'n*, 616 So. 2d at 569. *See also Demby*, 667 So. 2d at 353 ("[A]nyone who publishes defamatory matter is not liable if the remarks are published upon a conditionally privileged occasion and the privilege is not abused.").

[141] Pl.'s Br., at 52–55.

plaintiff."[142] Determining whether a statement if defamatory is primarily a function of the Court.[143] The Court must view the statement in its entirety.[144] If a statement is capable of more than one meaning, it is for "the trier of fact [to] determine whether the language used was actually understood in its defamatory sense."[145]

Here, Billy's email is open to multiple meanings or interpretations; though the tone and tenor of it hardly lost on the average reader. The Court simply cannot say that a reasonable reading of the email precludes a finding that it is defamatory. Thus, it must be submitted to more thorough factfinding at trial to determine if the email's language is understood in a defamatory sense.

Turning to Bobcat's argument that the email is an opinion, Florida law indeed shields "statements of *pure opinion*" from defamation liabilities.[146] But "mixed

---

[142] *NITV, L.L.C. v. Baker*, 61 So. 3d 1249, 1252 (Fla. Dist. Ct. App. 2011) (quoting *Razner v. Wellington Reg'l Med. Ctr., Inc.*, 837 So. 2d 437, 441 (Fla. Dist. Ct. App. 2002)).

[143] *Smith v. Cuban Am. Nat. Found.*, 731 So. 2d 702, 704 (Fla. Dist. Ct. App. 1999) ("The court has a 'prominent function' in determining whether a statement is defamatory, and if a statement is not capable of a defamatory meaning, it should not be submitted to a jury.").

[144] *Id.* at 705 ("[A] publication must be considered in its totality…To determine whether a statement is defamatory, it must be considered in the context of the publication.") (internal quotation marks and citations omitted).

[145] *Id.*

[146] *E. Air Lines, Inc. v. Gellert*, 438 So. 2d 923, 927 (Fla. Dist. Ct. App. 1983).

opinion" that, "although ostensibly in the form of an opinion, implies the allegation of undisclosed defamatory facts as the basis for the opinion, is actionable."[147]

A "pure opinion" differs from a "mixed opinion" in that:

> "Pure opinion occurs when the defendant makes a comment or opinion based on facts which are set forth in the article or which are otherwise known or available to the reader or listener as a member of the public. Mixed expression of opinion occurs when an opinion or comment is made which is based upon facts regarding the plaintiff or his conduct that have not been stated in the article or assumed to exist by the parties to the communication."[148]

Florida courts have consistently found statements to be non-defamatory "pure opinions" when the recipient of the communication knew, or was reasonably expected to know, the facts and situations surrounding the statements.[149]

In part, Billy's email reads:

> It seems that the company (Inland Services of Florida, LLC) bidding your refuse collection contract is in direct violation of our purchase and sale agreement of 5/31/16 as well as the non-compete agreement that goes hand in hand with that PSA. Bart Begley and Monty Davison sold Inland to us in May of 2016 and have no RIGHT to use the references that would allow them to

---

[147]    *Id.* (internal quotations marks omitted).

[148]    *From v. Tallahassee Democrat, Inc.*, 400 So. 2d 52, 54 (Fla. Dist. Ct. App. 1981), *rev. denied*, 412 So.2d 465 (Fla. 1982).

[149]    *See, e.g., From*, 400 So. 2d at 57 (finding the statements published on the tennis column of a local newspaper concerning a local tennis professional to be non-defamatory because the newspaper's audience would be expected to know both the tennis professional's situation and his performance in the local community); *Demby*, 667 So. 2d at 355 (finding that the county commissioner who received the statements would be expected to know the claimant's situation in connection with the statements).

bid your contract making this a VERY legal, sticky situation if they were awarded this contract. Having said that I wanted you to know where we stand, we will proceed with ANY and ALL legal recourse if those references were used in the Okaloosa Bid. Which I know they were used because it is the only way they would be QUALIFIED!!!! Our attorneys have already been prepped and ready to proceed as we have been monitoring your bid closely.

Feel free to contact me anytime, thank you and have a great day.[150]

There is no record evidence the Okaloosa Board knew, or could be reasonably expected to have known, the facts or situations surrounding Billy's claims. Nothing in the record suggests the Okaloosa Board was in any way privy to the private transactional arrangements between Bobcat and Inland. Unlike those found to have received statements of "pure opinion," nothing here suggests the Okaloosa Board knew, or could reasonably be expected to know, whether Inland Florida and Begley/Davison violated the UPA. At most, Billy's statements are a mixture of his opinions, what he believes to be facts, his strongly held feelings, and his threats of litigation. The Court can't say here, on this record, that judgment as a matter of law on the defamation counterclaim is warranted.

---

[150] Ex. I to Pl.'s Br., February 14, 2017 Email from Mr. William "Billy" Dietrich to Commissioner Ketchel (capitalization in original).

Bobcat's last attempt to gain summary judgment on the defamation counterclaim is its suggestion that even if the email does contain factual content, those statements are true under Florida's "substantial truth doctrine."[151]

The "substantial truth doctrine" provides "a statement does not have to be perfectly accurate if the 'gist' or the 'sting' of the statement is true."[152] Falsity exists if the publication is "substantially and materially false, not just if it is technically false."[153] In addition, a statement is false if it would have a different effect on the reader from what the pleaded truth would have produced.[154] The defense of truth is a question for the factfinder at trial.[155]

Under the substantial truth doctrine, the "gist" of Billy's email is that Inland Florida breached the UPA's confidentiality agreement, and Begley and Davison used the protected references without Bobcat's authorization. As the Court noted before, the alleged breach of the UPA has not been determined, yet the Board could have read the email to mean that the breach was indeed real. Thus, a trial factfinder

---

[151]    Pl.'s Br., at 52–55.

[152]    *Smith*, 731 So. 2d at 706.

[153]    *Id.* at 707.

[154]    *Id.* (quotation omitted).

[155]    *Glickman v. Potamkin*, 454 So. 2d 612, 613 (Fla. Dist. Ct. App. 1984) ("[T]he affirmative defenses of truth, good motive and qualified privilege present factual questions for resolution by the jury.").

could find that those statements have a different effect on the reader or that they are not "substantially and materially true."

### 3. *The Same Outcome Under the* Noerr-Pennington *Doctrine.*

Having concluded the qualified privilege analysis under Florida law, Bobcat's *Noerr-Pennington* arguments nevertheless bear on the question of *Noerr-Pennington* immunity's application to tort claims arising under state law. This question is implicated by the federal Constitution's Supremacy Clause.[156] Florida's declination to adopt the *Noerr-Pennington* analysis has not been without criticism.[157] And Florida's application of its recognized qualified privilege to petitioning activities has been seemingly sparse. So, if for nothing more that the

---

[156] Courts have long faced this question in their attempts to reconcile other courts' decisions and to determine an appropriate approach to resolving disputes. *See, e.g., Nat'l Org. for Women, Inc. v. Scheidler*, 1997 WL 610782, at *30–31 (N.D. Ill. Sept. 23, 1997) (having noted that "caselaw addressing the question whether the *Noerr-Pennington* doctrine brings first amendment principles to bear on state law tort claims," the court declined to apply the state law of tortious interference because doing so would violate the First Amendment.); *cf. Myers v. Levy*, 808 N.E.2d 1139, 1150–52 (Ill. App. Ct. 2004) (noticing that "[t]here is a notable amount of case law addressing the question whether the *Noerr–Pennington* doctrine brings first amendment principles to bear on state-law tort claims," the court declined to "expand [the first amendment] privilege into an absolute one" to the claims for defamation and false light invasion of privacy.) (quoting *McDonald v. Smith*, 472 U.S. 479, 485 (1985)).

[157] *Computer Assocs. Int'l, Inc. v. Am. Fundware, Inc.*, 831 F. Supp. 1516, 1523 (D. Colo. 1993) (recognizing that *Noerr-Pennington* immunity is a aconstitutional, not an antitrust, doctrine, and criticizing that *Fla. Fern Growers Ass'n* "ignored principles of federalism and t[ook] the questionable approach . . . [of] view[ing] this as an issue of state law."); *Kinsman v. Winston*, 2015 WL 12839267, at *8 (M.D. Fla. Sept. 15, 2015) (having applied the *Noerr-Pennington* doctrine, the court also conducted the "conditional privilege" analysis and found that the same result would flow).

sake of completeness, this Court cannot simply ignore Bobcat's attempt to invoke *Noerr-Pennington* immunity.

While Florida courts characterize *Noerr-Pennington* as an antitrust doctrine,[158] other courts have recognized it as Constitution-based not limited to antitrust claims.[159] Those courts have applied *Noerr-Pennington* immunity to wide-ranging tort claims rising under state laws.[160]

---

[158] *Fla. Fern Growers Ass'n*, 616 So. 2d at 566–67.

[159] *See, e.g., Computer Assocs. Int'l*, 831 F. Supp. at 1523 ("Thus *Professional Real Estate Investors* and *Claiborne Hardware* [decisions] support the proposition that *Noerr–Pennington* immunity is a constitutional, not an antitrust, doctrine."); *Campbell v. PMI Food Equip. Group, Inc.*, 509 F.3d 776, 790 (6th Cir. 2007) (noting that "[a]lthough the *Noerr-Pennington* doctrine was initially recognized in the antitrust field, the federal courts have by analogy applied it to claims brought under both state and federal laws, including common law claims of tortious interference."); *RRR Farms, Ltd. v. Am. Horse Prot. Ass'n, Inc.*, 957 S.W.2d 121, 128 (Tex. App. 1997) ("Lower federal and state courts have adopted *Noerr*'s deference to the right to petition not only in antitrust cases, but in other cases involving civil liability."), *holding modified by Baty v. ProTech Ins. Agency*, 63 S.W.3d 841 (Tex. App. 2001).

[160] *See, e.g., Computer Assocs. Int'l*, 831 F. Supp. at 1523 (claim for unfair competition); *McGuire Oil Co.*, 958 F.2d at 1561 (unfair trade practices claim); *IGEN Int'l, Inc. v. Roche Diagnostics GmbH*, 335 F.3d 303, 312 (4th Cir. 2003) ("[A]lthough originally developed in the antitrust context, the doctrine has now universally been applied to business torts"); *Bath Petroleum Storage, Inc. v. Market Hub Partners, L.P.*, 229 F.3d 1135, 1135 (2d Cir. 2000) ("state-law claims such as fraud and tortious interference"); *Cheminor Drugs, Ltd. v. Ethyl Corp.*, 168 F.3d 119, 128–29 (3d Cir. 1999) (tortious interference and unfair competition claims); *Proportion-Air, Inc. v. Buzmatics, Inc.*, 57 F.3d 1085, 1085 (Fed. Cir. 1995) (tortious interference and unfair competition claims); *Oregon Nat. Res. Council v. Mohla*, 944 F.2d 531, 533 (9th Cir. 1991) (abuse of process and interference with business relations claims); *Video Int'l Prod. v. Warner-Amex Cable Comms., Inc.*, 858 F.2d 1075, 1084 (5th Cir. 1988) (business tort claims); *Hufsmith v. Weaver*, 817 F.2d 455, 458–59 (8th Cir. 1987) (tortious interference with business claims); *Havoco of Am., Ltd. v. Hollobow*, 702 F.2d 643, 649 (7th Cir. 1983) (tortious interference claim); *Campbell v. PMI Food Equip. Group, Inc.*, 509 F.3d 776, 790 (6th Cir. 2007) (recognizing "federal courts have by analogy applied [*Noerr-Pennington* doctrine] to claims brought under both state and federal laws, including common law claims of tortious interference"); *Suburban Restoration Co. v. ACMAT Corp.*, 700 F.2d 98, 102 (2d Cir. 1983) (claims based on state statute regulating unfair trade practices and common law claims of tortious interference with a business expectancy).

-46-

In contrast to the Florida state courts' approach, the federal courts of Florida have recognized the applicability of *Noerr-Pennington* immunity to petitioning activities.[161] In petitioning for adjudicative relief, *Noerr-Pennington* immunizes litigative activity (*e.g.*, commencement of a suit) and pre-litigative activity (*e.g.*, threats of litigation).[162] Later decisions, however, appear to have taken a more cautious, and perhaps limiting, approach that affords *Noerr-Pennington* immunity only to pre-litigative activity "necessarily preliminary" to the adjudicative proceedings.[163]

Of note also is the fact that, unlike other federal courts that have applied the *Noerr-Pennington* doctrine to a broad spectrum of state tort claims, Florida federal

---

[161] *McGuire Oil Co.*, 958 F.2d at 1561. *See also SilverHorse Racing, LLC v. Ford Motor Co.*, 2016 WL 7137273, at *3 (M.D. Fla. Apr. 27, 2016) ("'[I]t is hard to see any reason why, as an abstract matter, . . . common law torts . . . might not in some of their applications be found to violate the First Amendment.'") (quoting *Whelan*, 48 F.3d at 1254).

[162] *McGuire Oil Co.*, 958 F.2d at 1560, *accord Coastal States Mktg., Inc. v. Hunt*, 694 F.2d 1358, 1367 (5th Cir. 1983). *See also Atico Int'l USA*, 2009 WL 2589148, at *3 (S.D. Fla. Aug. 19, 2009) (holding that *Noerr-Pennington* protects a pre-litigation letter prepared and sent by an intellectual property counsel and threatening litigation).

[163] *Orange Lake Country Club, Inc. v. Reed Hein & Assocs., LLC*, 2019 WL 645214, at *9 (M.D. Fla. Jan. 4, 2019) (holding that the *Noerr-Pennington* privilege "arises immediately upon the doing of any act required or permitted by law in the due course of the judicial proceeding or as necessarily preliminary thereto," and concluding that, in the context of pre-litigation activity, *Noerr-Pennington* privilege only applies to statements "necessarily preliminary" to judicial proceedings such as pre-suit communications required by statute or by contract as a condition precedent to suit). *See also Trent v. Mortg. Elec. Registration Sys., Inc.*, 618 F. Supp. 2d 1356, 1359 (M.D. Fla. 2007), *aff'd*, 288 F. App'x 571 (11th Cir. 2008) (declining to extend the litigation privilege to "pre-suit communications" where such communications were not required by law).

courts seem to adhere to the doctrine's antitrust law origin and are less inclined to extend the immunity to activities unrelated to anticompetitive conduct.[164]

The Court notes all of this to aid in the understanding of its constrained application of the *Noerr-Pennington* doctrine here. Bobcat argues that Billy's email is privileged pre-litigation activity that is objectively meritorious and, thus, not a sham.[165] But privileged pre-litigation acts that have been recognized by Florida courts share certain commonalities, they: are formalistic (often prepared by attorneys); specify the complained-of conduct and the litigation threatened; and are generally followed by actual lawsuits based on the same subject matter.[166] Billy's

---

[164] *Marco Island Cable, Inc. v. Comcast Cablevision of the S., Inc.*, 2006 WL 1814333, at *10 (M.D. Fla. July 3, 2006) (extending *Noerr–Pennington* immunity to the Florida Deceptive and Unfair Trade Practices Act that mirrors Federal Sherman Act that also regulates anticompetitive act). *But Cf. Slip-N-Slide Records, Inc. v. TVT Records, LLC*, 2007 WL 473273, at *7 (S.D. Fla. Feb. 8, 2007) (refusing to extend *Noerr–Pennington* immunity to traditionally asserted state tort claims "wholly unrelated to an antitrust claim"); *Cisson v. Claudio & Johnson, LLC*, 2017 WL 1857419, at *3 (M.D. Fla. Mar. 2, 2017) (declining to extend *Noerr-Pennington* doctrine to claims brought under Florida Consumer Collection Practices Act); *Roban v. Marinosci Law Grp.*, 34 F. Supp. 3d 1252, 1255 (S.D. Fla. 2014) (refusing to apply *Noerr-Pennington* immunity to claims brought under Federal Debt Collection Practices Act). *See also Clearplay, Inc. v. Nissim Corp.*, 2011 WL 3878363, at *7 (S.D. Fla. Sept. 2, 2011) (noting that "while other Circuits have applied *Noerr–Pennington* immunity to bar not only anti-trust claims but also state tort claims, the Eleventh Circuit has done so only in a very specific context."), *aff'd*, 496 F. App'x 963 (11th Cir. 2012), *cert. denied*, 570 U.S. 919 (2013); *Slip-N-Slide Records*, 2007 WL 473273, at *7 (criticizing that "[f]rankly, the doctrine has likely been extended far beyond what the exercise of judicial restraint should allow").

[165] Pl.'s Br., at 42–45.

[166] *McGuire Oil Co.*, 958 F.2d at 1560 (the threat is specific as to the statutory basis of the claim, and actual suit was later brought thereunder. The court also held that repeated threats of litigation as a method of creating or maintaining anti-competitive conduct is within the scope of the immunity, and does not fall within the sham exception); *Atico Int'l USA*, 2009 WL 2589148, at *3 (pre-litigation letter prepared and sent by intellectual property counsel threatening litigation

-48-

email lacks much of these—it wasn't prepared by an attorney, has no formalistic elements, and is devoid of any real specificity. On multiple occasions, the email used words and phrases in all capitalized letters, presumably to express threat. Yet it is unclear what litigation is threatened, against whom, and on what specific wrongdoing. A reasonable reader can't even discern whether the litigation is threatened against Okaloosa, Inland Florida, Begley, Davison, or all the above.

Accordingly, the Court concludes on the present record that even under the *Noerr-Pennington* doctrine Bobcat is not due summary judgment on Inland's tortious interference and defamation counterclaims. And so, Bobcat's motion on those counterclaims must be **DENIED**.

## V.    CONCLUSION

For the reasons discussed, Bobcat's Motion for Partial Summary Judgment is **GRANTED**, in part, and **DENIED**, in part.

**IT IS SO ORDERED.**

**Paul R. Wallace, Judge**

---

of patent infringement and such suit was later filed is privileged); *Marco Island Cable*, 2006 WL 1814333, at *1 (immunizing letters threatening to enforce the exclusive contract where actual suit is filed); *Silverhorse Racing*, 232 F.Supp.3d 1206 (demand letters sent to trademark infringers' business partners requesting them to remove infringing products and stop infringing activity is immunized and is not "sham").